H. H. SCOTT, INC., a Massachusetts corporation,

v.

ANNAPOLIS ELECTROACOUSTIC CORP., a Maryland corporation, also trading as Scott Laboratories, Inc., Division, Defendant,

and

Scott Radio Laboratories, Inc., Intervening Defendant.

Civ. No. 12669.

United States District Court
D. Maryland.

June 16, 1961.

Melvin J. Sykes, Baltimore, Md., and Robert H. Rines, David Rines, and Rines & Rines, Boston, Mass., for plaintiff.

William L. Marbury, John Martin Jones, Jr., Piper & Marbury, Baltimore, Md., Barham R. Gary, Annapolis, Md., and Stewart W. Richards, New York City, for defendant and intervening defendant.

THOMSEN, Chief Judge.

Plaintiff, H. H. Scott, Inc. (H. H. Scott), a manufacturer of high fidelity components since 1946, seeks to enjoin defendant Annapolis Electronics Corp. (Annapolis) and intervening defendant Scott Radio Laboratories, Inc. (Scott-N.Y.), a wholly owned subsidiary of Annapolis, from using the name or trademark SCOTT or *SCOTT* in connection with the manufacture or sale of audio-reproduction equipment. Defendants rely upon the prior use and registration of those trade-marks by an Illinois corporation formerly known as Scott Radio Laboratories, Inc. (Scott-Ill.), and the acquisition of those marks by Scott-N.Y. in the late 1950's as the result of a series of transfers; they seek to limit plaintiff to the use of the name or mark H. H. SCOTT, and to prevent its use of the name or mark SCOTT, by which its products are generally known in the market. The case involves rights and obligations under the common law and under the Lanham Act, questions of alleged transfers in gross, of abandonment, of use of the assigned marks by Scott-N.Y. and its owners to misrepresent the source of its products, of laches, acquiescence and estoppel, and of unclean hands.

### Facts

Both sides proposed many detailed findings of fact, upon which I have ruled. The following statement, which includes a number of inferences and conclusions based on the detailed findings, is sufficient for an understanding of the issues.

### The Market

Although the term high fidelity was used before World War II to describe a characteristic of the finest phonographs, AM radios and combinations of the two, the term high fidelity (or hi-fi) in its presently accepted sense came into general use in the late 1940's with the development of FM radio and long-playing records. The first hi-fi equipment was developed and used by engineers and by hobbyists with technical training or skill. It usually consisted of separately packaged components of a sound-reproduction system, such as amplifiers, tuners, pre-amplifiers, pickups and speakers, which were manufactured and sold by a number of small companies, and were so designed that a component made by one company could readily be used in association with components made by other companies as well as with components made by the same company.

The large concerns continued to manufacture and sell consoles—radios, phono-

graphs or combinations—each of which comprised a single cabinet housing an integrated sound-reproduction system designed to operate as a unit. The amplifier or the tuner of such a system could not ordinarily be used with the tuner or amplifier of another manufacturer. The two markets were generally discrete, the hi-fi equipment being sold largely through specialty shops, and the consoles through department stores and music stores, although some music stores carried both lines, usually in separate departments. Occasionally some or all of the parts of a large unit would be taken out of the cabinet and scattered around a room in a custom installation, and some hi-fi dealers would assemble components into cabinets for their less talented or more conventional customers.

Several factors, however, have served to unify the markets. The development of television brought about a sharp decline in the manufacture and sale of radio-phonograph consoles. Then, in the mid-50's, hi-fi developed a general appeal. The large console manufacturers began to describe their highest quality products as hi-fi, and some of them began to sell components which could readily be used with the components of other manufacturers. Some of the best component manufacturers began to mount their products firmly into cabinets, which were sold as consoles or component consoles. Dealers began to assemble into a single cabinet components produced by various manufacturers, and to sell the unit under the name of the manufacturer of the amplifier, the tuner, or other important component. The retail distribution channels of the component manufacturers and the console manufacturers have

merged to a considerable degree, and many consumers are now likely to consider both types of systems. Since 1956 there has been a unified market.

### Scott-Ill.

In 1929 an Australian named E. H. Scott organized an Illinois corporation named Scott Transformer Co. (Scott-Ill.). Its name was changed to E. H. Scott Radio Laboratories, Inc. in 1937, to Scott Radio Laboratories, Inc. in 1945, and to Electrovision Corp. in 1959, after it had passed through bankruptcy. Before World War II, Scott-Ill. produced a radio-phonograph console which was one of the best, if not the best available.[1] In 1932 it registered the trademark SCOTT on the Supplemental Register under the Act of March 19, 1920, for the use on various basic items of audio-reproduction equipment. That mark was renewed under its original number (296,757) on the Supplemental Register in 1952. During World War II Scott-Ill. produced short wave radios for the armed forces, but spent large sums for "institutional advertising". After the war E. H. Scott sold his stock to a new group, headed by Hal Darr, who continued to produce high quality radio-phonograph combinations. In 1948 Scott-Ill. registered the trade-mark *SCOTT* on the Principal Register (504,-824).

In 1950–51 John Meck of Chicago bought a controlling interest in Scott-Ill. and merged John Meck Industries into it. The merged corporation continued to produce some radio-phonographs but its principal products were TV sets, many of which were cheap and were sold under trade-marks other than SCOTT.[2] It went into bankruptcy in 1956.

1. Some equipment was sold in the form of separate assemblies for custom installation, in gardens as well as in houses.

2. In 1952 the SCOTT line represented about 18% of Scott-Ill.'s total sales of $4,000,000. Its sales dropped to $2,143,-000 in 1954, to $892,000 in 1952, and even lower in 1956, when it went into bank-

ruptcy. It is not possible to tell from the evidence whether the quality of the SCOTT line sold by Scott-Ill. from 1954 to 1956 was high or low, how large a volume was sold, and whether Scott-Ill. ever entered the component market, as distinguished from the sale of replacement parts and the occasional sale of

## H. H. Scott

Herman Hosmer Scott is a well-known and respected electronic engineer. In 1946 he patented a dynaural noise suppressor, which eliminated scratch and surface noises from phonograph records, and licensed its use by several manufacturers, including Scott-Ill. The licensing agreement with Scott-Ill. permitted the use of the noise suppressor as part of phonographs sold under the brand name or trade-mark SCOTT, and required Scott-Ill. not to create the impression that the noise suppressor was an original development of Scott-Ill., but to make sure that in advertising copy the full name Herman Hosmer Scott would be used.

In 1946 H. H. Scott developed the first true high fidelity amplifiers, and began to manufacture and sell them through a corporation he had organized, the name of which was changed to Herman Hosmer Scott, Inc. in 1947 and to H. H. Scott, Inc. in 1958. The products of that corporation, the plaintiff herein, were marked H. H. SCOTT, even before the name of the corporation was changed. By 1954 plaintiff had a line of high fidelity components, including amplifiers, pre-amplifiers and a speaker crossover, a device for channeling high frequency sounds to the "tweeter" and low frequency sounds to the "woofer". In 1954 tuners were added to the line, and in 1955 a record turntable.

Plaintiff's products have consistently been of the highest grade. They were sold under the trade-mark H. H. SCOTT in the nationwide component market until it merged into the unitary market. However, plaintiff's components have been generally referred to by dealers and by writers in the trade press and in magazines of general circulation as SCOTT amplifiers, tuners, etc. In the many dealers' catalogues offered in evidence, about half of plaintiff's items were referred to as SCOTT Amplifiers, etc., the other half as H. H. SCOTT Amplifiers, both designations often appearing in the same catalogue. In the component market since 1946, and in the unitary market since the bankruptcy of Scott-Ill. in 1956, the name SCOTT has come to mean the products of the plaintiff corporation, H. H. Scott, Inc.

In recent years plaintiff's officers have been planning to enter the console field; its first consoles have been designed and advertised; they are now being manufactured and will be sold on a nationwide basis in a short while.

### The Bankruptcy Sale

A bankruptcy petition against Scott-Ill. was filed in the Northern District of Indiana in August, 1956. The corporation was adjudicated a bankrupt in September, 1956, and on October 30–31, 1956, its assets were sold in separate lots. One lot consisted of "the good-will and trade names of Scott Radio Laboratories, Inc., including copyrights, if any, and patents, if any, trademarks, if any, and all engineering data, if any, blue prints, drawings, lists of customers, if any, together with the right to use the name 'Successors to Scott Radio Laboratories, Inc.'". No inventory was included in that lot. The capital stock of the company was not sold, and after its discharge in 1959, Scott-Ill. resumed business under the name Electrovision Corp.

The lot referred to above was sold for $8,000 to Benjamin Kaye, Jerome Wiesenthal and Richard S. Wiesenthal (the K-W group), the principal owners of Liberty Music Shops, Inc. (Liberty), a large retailer in New York City, having several branches in that city and its suburbs. The sale was approved by the referee in bankruptcy on November 2, 1956, and the trustee in bankruptcy executed a bill of sale to Liberty, which had

unmounted systems for deluxe custom installations. So far as it may be important for either side to prove any of those facts, I find against the party having the burden of proof; particularly, I find that defendants have not shown that Scott-Ill. entered the component market as it existed before 1950.

actually put up the money. The bill of sale was delivered in March, 1957, and the trade-marks a month or two later. Liberty had at one time carried the Scott-Ill. line of consoles and was then and had been for some time carrying plaintiff's line of components. The K-W group was not interested in any part of its purchase except the SCOTT trade-marks and the good will associated therewith. They used none of the other trade-marks, and none of the patents or customers' lists; they discarded the blue-prints and engineering data and junked the tools and dies. Liberty assigned to the K-W group, by an instrument bearing the same date as the trustee's bill of sale, the assets transferred to it.

Neither the trustee's assignment nor the assignment by Liberty was recorded in the Patent Office. In 1957 the K-W group organized a New York corporation named Scott High Fidelity Laboratories, Inc. (Scott-N.Y.), and on May 25, 1957, Liberty, purportedly acting as agent for the K-W group, executed an assignment, likewise unrecorded, to Scott-N.Y. of the assets purchased from the bankrupt estate.

### Activities of the K-W Group, Liberty and Scott-N.Y.

Shortly thereafter Scott-N.Y., Liberty and the K-W group arranged to assemble in the name of Scott-N.Y., and to sell exclusively through Liberty's retail stores in metropolitan New York a line of consoles. The equipment in those consoles was made up of components purchased from various manufacturers. Most of the manufacturers were well known in the field, but the components were generally selected from their cheap lines. These consoles were marked SCOTT or *SCOTT*, and were sold by Liberty under that name.

H. H. Scott learned of the retail sales of such consoles by Liberty in September 1957, but since Liberty was then a large dealer in plaintiff's components, since H. H. Scott thought Liberty had acquired the right to use the mark in that way, and since Liberty assured plaintiff that it would make every reasonable effort to avoid confusion, plaintiff took no action to prevent such use of the mark by Scott-N.Y. or by Liberty, and continued to sell its components to Liberty.

In 1959 the K-W group, Liberty and Scott-N.Y. caused to be manufactured and sold in the Liberty retail stores some components marked SCOTT. When plaintiff learned that Liberty was selling components under that name, it immediately ceased doing business with Liberty and began to consider the desirability of legal action.

In various ways which are set out in the detailed findings of fact, the K-W group, Liberty and Scott-N.Y., during the period 1957 to 1960, combined and conspired to pass off as plaintiff's components, the components in their SCOTT consoles and the separate components which they began to sell in 1959. They used the registered marks which they had purchased to misrepresent the source of the goods in connection with which the marks were used.

The K-W group had not purchased the trade-marks and other assets from the trustee in bankruptcy of Scott-Ill. with the intention of continuing its business, i. e. the business of developing and manufacturing audio-reproduction equipment and distributing the same nationally. The K-W group bought the trade-marks and other assets with the intent to use only the SCOTT marks, and to use them only in connection with Liberty's retail business in metropolitan New York. In fact they used the marks solely for that purpose. They—the K-W group and their corporation, Scott-N.Y., the intervening defendant herein—abandoned the national use of the trade-marks SCOTT and *SCOTT* and allowed the mark SCOTT to acquire in the market a special significance as identifying the goods of the plaintiff, H. H. Scott, Inc.

### Annapolis Electroacoustic Corp.

Defendant Annapolis Electroacoustic Corp. (Annapolis) was organized in October 1958 by a group associated with

Chesapeake Instrument Corp., a company specializing in research and development of electroacoustic devices for the government. The group originally engaged in the sale of high fidelity products at retail in Annapolis, Maryland,· but in 1959 decided to enter the field of manufacturing audio-reproduction equipment. Leon Knize, who had been manager of consumer products for the Stromberg Carlson Company, became associated with the Annapolis group, and capital of over $200,000 was subscribed. Knize suggested that Annapolis could enter the market more rapidly and inexpensively if it had a name that was already known and suggested that the SCOTT name and trade-marks might be available. The Chesapeake group felt that if a trade-mark of that type could be acquired for less than the cost of creating a comparable image for Annapolis through extensive advertising, it should be done. Knize was authorized to look into the matter and he approached the K-W group. Patent counsel for Chesapeake checked the legal aspects. After negotiations, Annapolis entered into an agreement dated July 25, 1960, with the K-W group, as owners of all the outstanding shares of Scott-N.Y. The agreement provided for the sale of all the capital stock of Scott-N.Y. by the K-W group to Annapolis for $255,000, payable $15,000 on August 3, 1960, $15,000 on November 1, 1960, and the balance in quarterly instalments on the basis of one percent of the net sales, with stipulated minimum quarterly payments and a requirement that the full balance be paid by March 1, 1969. As a further consideration for the sale of the stock, the K-W group obtained 5,000 shares of the stock of Annapolis and options for 2,500 more. The agreement contained the following provisions:

"6. * * *

"(a) Between the date of this agreement and the date of closing the corporation [Scott-N.Y.] will not enter into any agreements or incur any obligations which will survive the date of closing.

"(b) Before the date of closing, the corporation will divest itself of all of its assets, except those set forth in Schedule A annexed hereto, and will satisfy all of its obligations and liabilities. The sellers will cause the corporation's liabilities and obligations, including but not limited to its liability for taxes, which are not satisfied as of the date of closing, to be paid and/or discharged."

Schedule A, set forth on page 9 of the agreement, read as follows:

"Trademarks registered in the United States Patent Office, Nos. 296,757, 504,826, 557,313, 571,715, all foreign trademark registrations acquired by Scott Hi Fidelity Laboratories still unexpired.. No representations concerning validity or freedom from claims, license encumberances, are made with respect to said foreign trademark registrations."

Only the corporate shell as owner of the trade-marks passed to the new owner of the stock. No employees, equipment, blueprints, engineering or specifications went along. The entire inventory of Scott-N.Y. had been transferred to Liberty. A separate agreement, also dated July 25, 1960, provided that Liberty should dispose of this inventory by March 1, 1961, or by the date of the first shipment of "Annapolis Scott" products, whichever was later. If the inventory was not disposed of by the later of the two dates, the parties would renegotiate with respect to the disposition of the merchandise so that Liberty would not take a loss on it. Liberty continued to sell its "Scott inventory" as SCOTT after July 25, 1960. By the same marketing agreement, Liberty was designated the exclusive franchisee in New York of the products manufactured by Scott-N.Y., now controlled by Annapolis, so long as it takes a fixed percentage of the output of that corporation.

Shortly thereafter Annapolis, as sole stockholder of Scott-N.Y., had the name of that corporation changed to "Scott

Radio Laboratories, Inc.", the exact name of the Illinois corporation at the time of its bankruptcy. This was done because the Annapolis group "wanted to tell the public that Annapolis was the Illinois company", and that they wanted "to be and continue the good reputation and quality of the corporation".

The Annapolis group wrote a letter to dealers saying: "The first thing we did was purchase the assets of Scott Laboratories of Chicago. We will operate Scott Laboratories as a division of Annapolis Electroacoustic Corp. and Scott will be our brand name." On December 4, 1960, Annapolis and Liberty placed an advertisement in the New York Times advertising Scott-N.Y.'s products as being made by "the original Scott, producers of high fidelity equipment for thirty-four years".

In the fall of 1960, Scott-N.Y., under the direction of the Annapolis group, brought out its first product, a high quality revolutionary speaker system, which has been sold under the name and mark *SCOTT* by Liberty in the metropolitan New York market and by some dealers elsewhere.

Both the Annapolis and the K-W groups knew of plaintiff's activities and reputation in the market. Liberty had handled plaintiff's products for many years. The Annapolis group "did not concern themselves" with the problem of two Scotts in the field. Knize testified: "Our objectives in the high fidelity or in the audio-reproduction field are so much larger in scope in terms of market potential, in terms of market penetration, than the very narrow area that H. H. Scott operates within, that we just never considered it as a factor in our future * * we felt that we would be operating in a much larger arena, that we were going to be a much larger company, and that they would not affect us that much."

■ Based upon all the evidence, I find that a substantial segment of the consuming public would be confused by defendants' use of the name SCOTT as describing any equipment in the high fidelity field, whether components or consoles, produced by defendants.

## Discussion

At the date of its bankruptcy in 1956, Scott-Ill. had the right to use the trademarks SCOTT and *SCOTT* on all equipment, including both consoles and components, in the audio-reproduction field, which had only recently become a unitary market. Its right to use the mark *SCOTT* was incontestable except on grounds which constitute exceptions to incontestability under the Lanham Act. See 15 U.S.C.A. §§ 1064, 1065, 1115. At the same time the name SCOTT was becoming more and more associated with plaintiff's components in the minds of the public.

The validity and effect of the sale and assignment by the trustee in bankruptcy of Scott-Ill. will be discussed first.

## I.

### The Bankruptcy Sale

The assignment of registered marks is controlled by 15 U.S.C.A. § 1060, which provides in pertinent part:

"A registered mark or a mark for which application to register has been filed shall be assignable with the goodwill of the business in which the mark is used, or with that part of the goodwill of the business connected with the use of and symbolized by the mark, and in any such assignment it shall not be necessary to include the goodwill of the business connected with the use of and symbolized by any other mark used in the business or by the name or style under which the business is conducted: *Provided*, That any assigned registration may be canceled at any time if the registered mark is being used by, or with the permission of, the assignee so as to misrepresent the source of the goods or services in connection with which the mark is used. Assignments shall be by instruments in writing duly executed * * *."

The common law on the subject is set out in the Restatement, Torts, secs. 755 and 756:

"§ 755. Transfer in Gross

"A right to the use of a trade-mark or trade name cannot be transferred in gross.

"§ 756. Transfer with Subject Matter Associated With Trade-Mark or Trade Name

"A right to the use of a trade-mark or trade name can be transferred along with a subject matter with which the trade-mark or trade name is associated, if that subject matter is itself transferrable.

"Comment:

"a. General principle. When one who has a trade-mark or trade name transfers to another the subject matter with which it is associated, he may also effectively assign to the other his right to the use of the trade-mark or trade name. Thus, one who sells his business to another may include in the transfer the trade-mark or trade name used in the business. Even in such a case, it is possible that some misrepresentation may be involved in the subsequent use of the symbol by the transferee. But in so far as the purchaser continues the business of the transferor, the misrepresentation is not material and the symbol can, with substantial truth, attract the good will with which it was previously associated. It is assumed that the successor will maintain the qualities which the mark has come to identify. The possibility that he will change them is no greater than the possibility of a change in the absence of such a transfer. Under modern conditions, the personnel of a business is frequently shifting, and marketing methods are largely impersonal. The practice of transferring trademarks or trade names along with the business in which they are used is well recognized, and purchasers of goods or services are probably aware of it."

See also additional comments to sec. 756 and secs. 752 and 753, discussed below.

So far as this case is concerned there is little difference between the statute and the common law rule, but they are not easy to apply in practice. The principles which have governed the development of the law are discussed in 3 Callman, Unfair Competition and Trade-Marks, 2d ed., p. 1272. They are: "(1) The transfer of a trade-mark is the transfer of the good will it symbolizes * * *; (2) Good will is not an indivisible unit, but may vary with the association of ideas that the trade-mark generates * * *; (3) In every transfer, the Court must determine the function of the particular trade-mark, viz., whether it indicates origin, guarantees properties of the article, or is merely an advertising device, or whether several of these functions are combined; (4) A transfer which is likely to work a deception upon the public will not be tolerated."

Callman continues: "Analytically, the latter consideration is the most significant; the others are merely explanations of or bases for legal reasoning. If a prospective transfer is otherwise lawful—e. g., not violative of the anti-trust laws—the only limitation on it is that which is dictated by public policy. It is a cardinal rule that the public must not be deceived by the effect of a transfer. It should not be assumed, however, that this can be readily predicted. The commercial significance and function of the particular trade-mark must be appreciated and recognized in determining public reaction and the likelihood of deception." Op. cit. pp. 1272–1273.

As we have seen, the marks SCOTT and *SCOTT* had been used by Scott-Ill. since the early 1930's on radio-phonographs of high quality, manufactured by it and distributed throughout the country. The sale of such consoles had fallen off rapidly during the 1950's and although Scott-Ill. may have offered some components for sale, the name SCOTT

in the component market had become associated in the minds of the public with the high quality components sold by plaintiff H. H. Scott, Inc.

Scott-Ill. ceased operations early in 1956 and was adjudicated a bankrupt in September of that year. Its assets were sold at a receiver's sale on October 30–31, 1956. One of the lots consisted of "the good-will and trade names of Scott Radio Laboratories, Inc., including copyrights, if any, and patents, if any, trademarks, if any, and all engineering data, if any, blueprints, drawings, lists of customers, if any, together with the right to use the name 'Successors to Scott Radio Laboratories, Inc.'" That was the only lot purchased by the K-W group. The other assets were sold in other lots to other purchasers.

There are substantial reasons of public policy, illustrated by the evidence in this case, why such a bare sale of a bankrupt's good will and trade-marks apart from the business in which they are used should not be made and should not be held valid.[3]

■ But we are dealing here with a sale made under the jurisdiction of another federal court, in which other items were sold along with the trade-marks and good will. The law seems to be that such a transfer is valid, subject to the proviso in 15 U.S.C.A. § 1060, quoted above, and to the obligation on the buyer to use the marks in accordance with the rules of fair competition. Callman, op. cit., p. 1334; Andrew Jergens Co. v. Woodbury, Inc., D.Del., 273 F. 952, 959, affirmed 3 Cir., 279 F. 1016.

We must consider therefore: (II) whether the assignees abandoned the marks within the meaning of the statute, or ceased to use them in the business with reference to which the interest in

the marks was protected; and (III) whether the marks were used by or with the permission of the assignees so as to misrepresent the source of the goods in connection with which the marks were used.

## II.

### Abandonment and Cessation of Use

■ The term "abandoned" is defined in 15 U.S.C.A. § 1127, as follows:

"A mark shall be deemed to be 'abandoned'—

"(a) When its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances. Nonuse for two consecutive years shall be prima facie abandonment.

"(b) When any course of conduct of the registrant, including acts of omission as well as commission, causes the mark to lose its significance as an indication of origin."

As we have seen, the K-W group did not buy the trade-marks, good will, etc. from the trustee in bankruptcy with the intention of continuing the business of Scott-Ill. They were only interested in using the trade-marks in connection with the retail business of Liberty in metropolitan New York. With this intention in mind, the K-W group incorporated the intervening defendant, Scott-N.Y., in 1957 and transferred the marks to it.

During the period 1957 to 1960, while the K-W group was in control of Scott-N.Y., they discontinued the use of the marks SCOTT and *SCOTT* in the national market in which the marks had been used by Scott-Ill., but in which the name SCOTT had increasingly become associated with the products of the plaintiff, H. H. Scott, Inc. During that pe-

3. Interstate Distilleries, Inc. v. Sherwood Distilling & Distributing Co., 173 Md. 173, 181, 182, 195 A. 387; In re Jaysee Corset Co., S.D.N.Y., 201 F. 779; Mayer Fertilizer & Junk Co. v. Virginia-Carolina Chemical Co., D.C.Cir., 35 App.D.C. 425, 428; Macmahan Pharmacal Co. v. Denver Chemical Mfg. Co., 8 Cir., 113 F. 468, 475; Ward-Chandler Building Co. v. Caldwell, 8 Cal.App.2d 375, 47 P.2d 758; Avon Shoe Co. v. David Crystal, Inc., S.D.N.Y., 171 F.Supp. 293, affirmed 2 Cir., 279 F.2d 607; La Fayette Brewery v. Rock Island Brewing Co., Cust. & Pat. App., 87 F.2d 489.

riod the K-W group and their two corporations used the marks only in connection with the retail business of Liberty in metropolitan New York, for which use the marks had been purchased.

During the very same period the plaintiff, H. H. Scott, Inc., greatly increased its sales and the advertisement of its products throughout the country, and the name SCOTT acquired in the market a special significance as indicating the goods of the plaintiff rather than the goods of the intervening defendant Scott-N.Y.

Under these facts, the limited local retail use of the name and the marks by Scott-N.Y. and Liberty constituted an "abandonment" of the marks in the national market. 3 Callman, Unfair Competition and Trade-Marks, sec. 79, pp. 1352, 1353. The case of Dawn Donut v. Hart's Food Stores, Inc., 2 Cir., 267 F. 2d 358, upon which defendants rely, presented the converse of the present fact situation. There the plaintiff had regularly continued its business in many parts of the country, and merely discontinued the use of its marks in a few counties in New York State. Here the most that can be said for the defendants is that the business was continued in a few counties but discontinued elsewhere in the United States. Any dictum in the Second Circuit's opinion must be considered in the light of this distinction.

■ The cessation of use of the mark in the national market prevented Scott-N.Y. from resuming the discontinued use. Restatement, Torts, sec. 753 states:

"§ 753. Resumption of Discontinued Use

"One is not privileged to resume the use of a trade-mark or trade name or the physical appearance of goods previously used but discontinued by him, if, after the discontinuance and prior to the resumption,

"(a) another had adopted the designation or appearance in a competing business, and

"(b) the designation or appearance has acquired in the market a special significance as identifying the goods, services or business of the other rather than of the actor."

### III.

### Misrepresentation of Source

■ During the period 1957 to 1960, while both corporations were controlled by the K-W group, Scott-N.Y. and Liberty used the marks so as to misrepresent the source of the goods or services in connection with which the marks were used. In various ways listed in the detailed findings of fact they attempted to persuade and persuaded prospective purchasers to believe that (a) the components in the consoles which they were selling under the SCOTT name and mark, and (b) the other components which they began to sell in 1959 under the SCOTT name and mark, were the product of the plaintiff, H. H. Scott, Inc. Under the Lanham Act this is a ground for canceling the registration of the mark even though it has become otherwise incontestable. 15 U.S.C.A. §§ 1060, 1064, 1065, 1115(b) (3). See also Restatement, Torts, sec. 749.

The use of the mark since July 1960 will be discussed in the next section.

### IV.

### The Sale to Annapolis

The sale of the stock of Scott-N.Y. by the K-W group to Annapolis in July 1960 may be looked at in either of two ways: (a) as it technically was, a sale of the stock of an existing corporation so that the corporation continued in existence with whatever rights and impediments it had theretofore acquired; or (b) as essentially a sale of the trade-marks by the K-W group to Annapolis.

■ Looked at in the latter way, it is as bare a sale, as clearly a transfer in gross, as can be imagined. Such a transfer is invalid. Restatement, Torts, sec. 755. The right to use a trade-mark can be transferred only with the "goodwill of the business in which the mark is used, or with that part of the goodwill of the

business connected with the use of and symbolized by the mark." 15 U.S.C.A. § 1060. See also Restatement, Torts, sec. 756.

From 1956 until the sale in July 1960, the K-W group used the mark, only in connection with the retail sale by Liberty in metropolitan New York of equipment purchased, assembled and marked by Scott-N.Y. and Liberty for that purpose. The Annapolis group contemplated and has begun a different use in a different kind of business. Looked at as a sale of the trade-marks from the K-W group to the Annapolis group, therefore, the transfer would appear to be invalid.

■ Looked at the other way, it was a sale of stock in an existing continuing corporation, Scott-N.Y. The new management must take the corporation, cursed with the misrepresentations made by it, its stockholders and their associated corporation, Liberty, during the years 1957 to 1960. That is particularly true here, because although Annapolis became the only stockholder, the K-W group received a small stock interest in Annapolis and a substantial group of interests in the continuing success of Scott-N.Y.

Moreover, after the stock was purchased by the Annapolis group, they made efforts to persuade the public that the corporation is continuing the business of Scott-Ill. and to trade on the reputation of Scott-Ill. beyond the limits of equity and good conscience.[4]

Finally, whichever way the transfer of the stock is regarded, the abandonment of the mark by Scott-N.Y. while it was under the control of the K-W group is not cured.

### V.

### Laches, Acquiescence and Estoppel

■■ Mere delay is ordinarily no defense to a claim for injunctive relief in trade-mark and unfair competition cases, although it may preclude a claim for damages. Rothman v. Greyhound Corp., 4 Cir., 175 F.2d 893; Sears, Roebuck & Co. v. Allstates Trailer Rental, Inc., D. Md., 188 F.Supp. 170, 959; Nims Unfair Competition and Trade-marks, 4th ed., p. 1302, et seq. Where, however, laches or acquiescence is combined with elements of estoppel, plaintiff may also be barred from injunctive relief. Ambrosia Chocolate Co. v. Ambrosia Cake Bakery, 4 Cir., 165 F.2d 693; Landers Frary & Clark v. Universal Cooler Corp., 2 Cir., 85 F.2d 46. Defendant's good faith is an element to be considered when the defense of estoppel is raised. See Menendez v. Holt, 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526; McLean v. Fleming, 96 U.S. 245, 24 L.Ed. 828; Greyhound Corp. v. Rothman, D. Md., 84 F.Supp. 233, 242, affirmed 4 Cir., 175 F.2d 893; Callman, op. cit., vol. 4, sec. 87.3(b), pp. 1794–1799, and cases cited therein.

By September 1957 plaintiff had learned, or was charged with knowledge [5] that the K-W group had bought the Scott-Ill. trade-marks at the bankruptcy sale, and were causing their new corporation, Scott-N.Y., and their old corporation, Liberty, to assemble and sell at retail in the Liberty stores in metropolitan New York consoles under the SCOTT name and marks. Plaintiff acquiesced in that use, upon the assurance that reasonable efforts would be made to avoid confusion of source between those consoles and plaintiff's line of components, which Liberty continued to carry. When, in 1959, the K-W group caused Scott-N.Y. and Liberty to purchase, label and sell components under the SCOTT name, plaintiff did not demand that such sales be stopped, but refused thereafter to sell its line of components to Liberty, and began to consider the possibility of suit. Meanwhile Liberty continued to adver-

---

4. Plaintiff argues that defendants are also trying to trade on plaintiff's good will. However, the evidence on this question is not sufficient to satisfy me that this is true.

5. Johnston v. Standard Mining Co., 148 U.S. 360, 370, 13 S.Ct. 585, 37 L.Ed. 480; International Silver Co. v. Oneida Community, Ltd., 2 Cir., 73 F.2d 69, certiorari denied 295 U.S. 741, 55 S.Ct. 653, 79 L.Ed. 1688.

tise the retail sale of those products in metropolitan New York. Plaintiff learned from various sources that instead of making reasonable efforts to avoid confusion, as promised, Liberty had been palming off its consoles as products of plaintiff or as containing components which were products of plaintiff. When the Annapolis group made their first public announcement, in the latter part of 1960, indicating that they had purchased the SCOTT mark and intended to manufacture and sell on a national scale, plaintiff promptly brought this action to restrain such use of the mark.

Under these circumstances plaintiff may have been estopped—by its laches and acquiescence and by Liberty's expenditures for advertising—to prevent the continued sale of SCOTT consoles and possibly even SCOTT components by *Liberty*, at *retail*, in *metropolitan New York*. The answer to that issue would turn on the time when plaintiff is charged with knowledge that the K-W companies were violating their promise to try to avoid confusion between their consoles and plaintiff's components and were in fact palming off their products as plaintiff's.

But that is not the issue in this case. We are dealing here with a proposed *national* use of the SCOTT name and mark by a *manufacturer* which *now* intends to distribute consoles and components in the same market in which plaintiff's products are sold, and in which the name SCOTT has come to signify the high quality products manufactured and distributed by plaintiff. That distinctive meaning became increasingly significant and important during the period between the bankruptcy of Scott-Ill. in 1956 and the first advertisements of the Annapolis group in late 1960. During that period Scott-N.Y. and its then owners, the K-W group, limited the use of the Scott name and marks to retail sales by Liberty in the New York area, abandoned the business of Scott-Ill., i. e. the manufacture of goods for sale to and through dealers in the nationwide market.

Before considering the question of relief, one additional point raised by defendants must be decided.

## VI.

### Unclean Hands

Some allegations in the complaint and the affidavit in support of plaintiff's motion for a preliminary restraining order (which was not pressed when an early trial date was agreed upon) appear very close to, if not beyond the limits of permissible inference. These documents were prepared and drafted solely by plaintiff's Massachusetts counsel after consultation with officers of the plaintiff.

However, after carefully considering all the facts and law cited by the defendants, I cannot find as a fact nor hold as a matter of law that plaintiff's hands are unclean. It must be recognized that all counsel worked under great pressure; both sides sought an early trial; each side had to examine a great mass of documents, located in at least five states, and neither side was able to supply the other before trial all of the documents which it had promised to supply. Moreover, I found H. H. Scott to be a generally credible witness; and, certainly, the average credibility of plaintiff's witnesses did not fall below the average credibility of defendants' witnesses.

## VII.

### Relief

Plaintiff seeks to prevent any further use of the SCOTT or *SCOTT* name or marks by defendants. On the other hand, defendants seek to restrict plaintiff to the use of the name and mark H. H. SCOTT. Although contending that plaintiff is barred from all relief by unclean hands, laches, acquiescence and estoppel, defendants proposed a decree which would (1) require Scott-N.Y. to change its corporate name to "Scott Radio Laboratories of Annapolis, Inc."; (2) prohibit defendants from referring to Scott-Ill. except in conjunction with an explanatory phrase indicating that Scott-N.Y. is the

successor to that company; (3) permitting defendants to use the trade-marks *SCOTT* and SCOTT in the entire field of audio-reproduction equipment, except with regard to high fidelity components, other than speaker systems; (4) requiring their advertising to include their corporate name; and (5) enjoining defendants from palming off their goods as those of H. H. Scott, Inc.

These proposals do not go far enough to protect the public from the confusion which would inevitably occur. See Callman, op. cit., p. 1272, quoted at length in I. above, and the cases cited in note 3, supra. Nor do defendants' proposals adequately protect the good will which plaintiff has built up over the years by producing and selling high quality components under the name H. H. Scott, which the public has come to call SCOTT to such an extent that throughout the country the name SCOTT in the now unitary audio-reproduction field has acquired a special significance as identifying goods produced by plaintiff. See Restatement, Torts, sec. 753. The only use of the SCOTT name or mark by defendants from 1956 to late 1960, just before this suit was filed, was in connection with the retail business of Liberty in the metropolitan New York area. During that period, plaintiff greatly expanded its national sales and advertising, while defendant Scott-N.Y. ceased to use the name and marks in the business in which they had been used by Scott-Ill., namely, the manufacture and distribution of radio-phonographs, throughout the country. The name SCOTT has become identified in the minds of the public with the products of the plaintiff.

Under these circumstances, aside from a possible estoppel, plaintiff is entitled to an injunction preventing the resumption of the discontinued use. Restatement, Torts, sec. 753. And because the marks have been used by defendants to misrepresent the source of the goods, plaintiff is entitled to have the registration canceled. 15 U.S.C.A. § 1060.

The question of estoppel was considered in V., above. There is clearly no estoppel with respect to the use of the marks on a nationwide scale, outside of metropolitan New York. Whether the injunction should contain an exception permitting sales either in Liberty's retail stores or in metropolitan New York generally, presents a difficult question.

If this case involved only the relative rights and equities of the two parties, it might be proper to hold that such an exception should be included in the decree. But this is not such a case; the public also has a substantial interest in avoiding the confusion which would result from the sale in New York of two lines under the same name. It is true that in some cases a party may be estopped notwithstanding the public interest. But the elements of estoppel and the equities favoring the defendants would have to be much stronger than they are here.

An unqualified injunction is supported by the fact that defendants have spent little money in advertising their new SCOTT speaker system, or in promoting their proposed new line. They can change to a non-confusing name with relatively little difficulty or expense. The capital for Annapolis was subscribed before the stock of Scott-N.Y. was purchased and that purchase was admittedly made so that the Annapolis group could trade on the reputation of the old Scott-Ill. company. It appears that Annapolis signed an agreement to purchase an asset which the K-W group did not then own or have the right to sell, because it had lost the right to use the marks by abandonment, cessation of use, and use of the marks to misrepresent the source of the goods. The respective rights and obligations of the K-W group and the Annapolis group inter sese are not before the court in this case.

### Decree

It is this 16th day of June, 1961, by the United States District Court for the District of Maryland,

Ordered, adjudged and decreed as follows:

1. That defendants Annapolis Electroacoustic Corporation and Scott Radio Laboratories, Inc., their agents, servants,

employees, and all persons acting in concert with them be and they are hereby permanently restrained and enjoined in connection with the sale, manufacture, distribution or marketing of radio wave apparatus, record players and any and all audio-reproducing equipment, from directly or indirectly advertising, displaying, affixing or otherwise using or referring to the trade-mark or trade name SCOTT and any and all variations, combinations or colorable imitations thereof; provided, however, that this injunction is subject to the following interim provisions:

(a) For a period of seven months and fifteen days, commencing with the date of this decree, defendants may refer to the trade-mark or trade name SCOTT, or variations thereof, and may refer to defendant Scott Radio Laboratories, Inc., by its present name, in advertisements, circulars, or announcements designed to inform the trade and/or public of the fact that products previously marketed under the aforesaid trade names or marks will thereafter be marketed under such new trade names or marks as may be selected by defendants, so long as each such advertisement, or circular or announcement (i) clearly states the fact that the Scott marks or names will be changed, and (ii) contains no statement that defendant Scott Radio Laboratories, Inc., is the same company as the Illinois corporation which previously had the same corporate name or that defendant Scott Radio Laboratories, Inc., has purchased the assets of the aforesaid Illinois corporation.

(b) For a period of seven months and fifteen days, commencing with the date of this decree, defendants may sell and distribute the inventory of products marked with the SCOTT marks which they have on hand at the time of the entry of this decree and which defendants represent does not exceed 400 units of speaker systems, 200 radio-phonograph consoles and 2,000 television sets.

(c) For a period of forty-five days, commencing with the date of this decree, defendants may manufacture, market and sell under the SCOTT trade-marks or trade names additional speaker systems and television sets, if, but only if, defendants' inventory referred to in subparagraph (b) above is not sufficient to meet the demands of their customers during said forty-five day period, and provided that such additional production shall not exceed 200 units of speaker systems, 100 radio-phonograph consoles and 1,000 television sets.

2. The provisions of paragraph 1 shall not be deemed to require defendant to recall any trade notices which may have been released prior to the entry of this decree, or to reclaim any instruments which may be in the hands of dealers or other purchasers at the time of the entry of this decree or which may be sold to dealers thereafter pursuant to the provisions of paragraph 1, above. Similarly, the provisions of paragraph 1 shall not be deemed to prevent any dealer from selling any inventory of products marked with the SCOTT marks which he may have on hand at the time of the entry of this decree or which he may buy thereafter pursuant to the provisions of paragraph 1, above, nor shall it prevent any such dealer from advertising the same under the trade-mark or trade name SCOTT, as affixed thereon, in connection with the sale of such products. In connection with the sales of Scott products permitted in paragraph 1, defendants shall have the right to distribute to purchasers the usual printed materials which defendants customarily give to the purchasers of their products, regardless of the fact that certain of such materials may bear the Scott marks or trade names or the corporate name of defendant Scott Radio Laboratories, Inc.

3. That defendants Annapolis Electroacoustic Corporation and Scott Radio Laboratories, Inc., their agents, servants, employees, and all persons acting in concert with them be and they are hereby permanently restrained and enjoined from passing off, or attempting to pass off, or wilfully suffering or permitting to be passed off by any device whatsoever any audio-reproducing equipment manu-

factured, assembled, sold, distributed or marketed by defendants, as being goods manufactured, assembled, sold, distributed or marketed by plaintiff H. H. Scott, Inc.

4. That United States Trade-mark Registration Numbers 296757 (Supplemental Register), 504826 (Principal Register), 557313 (Principal Register) and 571715 (Principal Register) be and the same are hereby ordered canceled.

5. That defendant Scott Radio Laboratories, Inc., within forty-five days from the date of the entry of this decree, change its corporate name so that the word SCOTT, or any combination, variation or colorable imitation thereof does not appear in or constitute a part of its corporate name.

6. That the counterclaim of the defendant and intervening defendant be and the same is hereby dismissed.

7. That plaintiff is not entitled to damages or attorneys' fees and that each party shall bear its own costs.