**In the Matter of ROMAN CLEANSER COMPANY, Debtor.**

**ROMAN CLEANSER COMPANY and G.E. Grogan, Trustee, Plaintiffs,**

**v.**

**NATIONAL ACCEPTANCE COMPANY OF AMERICA, a Delaware corporation, and Patterson Laboratories, Inc., Defendants.**

**Bankruptcy No. 84–00459–B.
Adv. No. 84–0202–B.**

United States Bankruptcy Court,
E.D. Michigan, S.D.

Nov. 5, 1984.

Jaffe, Snider, Raitt & Heuer, P.C. by Lawrence R. Shoffner, Detroit, Mich., for Trustee.

Joseph S. Radom, P.C. by Thomas B. Radom, Southfield, Mich., for National Acceptance Co.

Clark, Klein & Beaumont by William B. Dunn, and Michael S. Khoury, Detroit, Mich., for Patterson Laboratories, Inc.

## MEMORANDUM OPINION

GEORGE BRODY, Bankruptcy Judge.

Roman Cleanser Company was a Michigan corporation engaged in the business of manufacturing, packaging and marketing a variety of items including "Roman Cleanser" and other household cleaning products. In connection with the business, the corporation employed the following federally registered trademarks: "Roman", registration number 912,017, originally registered on June 8, 1971; "Easy Monday", registration number 992,277, originally registered on September 3, 1974; "Romay", registration number 936,235, originally registered on June 20, 1972; and "Roman Cleanser", registration number 233,087, originally registered on September 20, 1927.

On November 15, 1983 Patterson Laboratories, Inc. (Patterson) entered into an agreement with Roman Cleanser Company to purchase all of Roman Cleanser's "machinery and equipment related to the manufacture of chemicals" for $175,000.00 and to loan $350,000.00 to the debtor. The agreement also provided that "[i]n the event of default by Roman, Patterson shall be entitled to and Roman grants to Patterson an exclusive perpetual license entitling Patterson to sell chemical products under all Roman owned trademarks/tradenames and labels; ...." On February 9, 1984, Roman Cleanser Company (debtor) filed a voluntary bankruptcy petition under chapter 11 pursuant to 11 United States Code § 301. On August 8, 1984, the case was converted to a proceeding under chapter 7. 11 U.S.C. § 1112. After the petition in bankruptcy was filed, Patterson filed a complaint for declaratory judgment contending that it was the owner of the debtor's trademarks by virtue of the debtor's default under the November, 1983 agreement. This claim was contested by the trustee. Subject to a determination by the court as to the respective interests of the estate and Patterson in the trademarks, the federally registered trademarks, formulas and customer lists were sold by the trustee to Michlin Chemical Corporation for $180,-000.00 and the claim of Patterson was transferred to the proceeds of sale. After the sale, National Acceptance Company of America (NAC) filed a motion to intervene, which was granted, contending that it had a security interest in the trademarks and that its interest was senior to any interests of either the estate or Patterson. Both the trustee and Patterson challenge the validity of NAC's security interest. This opinion deals solely with the question of the validity of NAC's security interest. The facts are not in dispute.

On January 18, 1978, the debtor executed a loan and security agreement granting NAC a security interest "in and to all of Roman Cleanser's then owned and thereafter acquired goods, equipment, and general intangibles and the proceeds thereof as collateral for the payment of all indebtedness and liabilities then existing or thereafter arising of Roman Cleanser to NAC." (NAC's Statement of Position, page 2). NAC filed a financing statement with the Michigan Secretary of State, pursuant to the Michigan Uniform Commercial Code. Mich.Comp.Laws § 440.9401 (1979). Sometime prior to the filing of the petition, NAC released its security interest in the vehicles, machinery, and equipment.[1]

The trustee initially contends that to perfect a security interest in a federally registered trademark a creditor must file a conditional assignment with the United States Patent and Trademark Office and since NAC did not do so, its security interest is unperfected. Surprisingly, there are no cases that address this issue.

Article 9 of the Michigan Uniform Commercial Code sets forth a comprehensive scheme for the regulation of security interests in personal property and fixtures. The basic scope of this article is found in M.C.L. § 440.9102(1), which states in pertinent part:

> Except as otherwise provided in section 9104 on excluded transactions, this article applies;
> (a) To any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, *general intangibles*, chattel paper or accounts; ...

(emphasis added).

The term "general intangibles" is defined in M.C.L. § 440.9106 as "any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments, and money." The Official UCC Comments state that the term "general intangibles" includes "[m]iscellaneous types of contractual rights and other personal property which are used or may become customarily used as commercial security. Examples are goodwill, literary

---

1. NAC subsequently filed five additional financing statements—three to perfect additional security interests obtained directly from the debtor, and two obtained by assignment from National Bank of Detroit. These are not pertinent to this controversy.

rights and rights to performance. Other examples are copyrights, *trademarks* and patents, except to the extent that they may be excluded by Section 9–104(a)." *Reprinted following*, M.C.L.A. § 440.9106 (1966) (emphasis added).

Trademarks are defined under federal law as "any word, name, symbol or device or any combination thereof adopted and used by a manufacturer or merchant to identify his goods and distinguish them from those manufactured or sold by others." 15 U.S.C. § 1127 (1982). Trademarks are valuable property rights. 1 J. McCarthy, *Trademarks and Unfair Competition*, § 2.8 p. 75 (2d ed.1984); *also compare, Trade-Mark Cases*, 10 Otto 82, 92, 100 U.S. 82, 92, 25 L.Ed. 550 (1879) (property right) *with, A. Bourjois & Co. v. Katzel*, 260 U.S. 689, 691, 43 S.Ct. 244, 245, 67 L.Ed. 464 (1922) (potentially great value). They are clearly general intangibles within the meaning of Article 9. *Heine-Geldern v. ESIC Capital, Inc. (In re Magnum Opus Electronics, Ltd.)*, 19 UCC Rep. Serv. (Callaghan) 242 (Bankr.S.D.N.Y. 1976). However, a finding that trademarks are general intangibles does not necessarily mean that the perfection of a security interest in such marks is governed by the Uniform Commercial Code.

M.C.L. § 440.9302 states, in pertinent part, that:

(3) The filing of a financing statement otherwise required by this article is not necessary or effective to perfect a security interest in property subject to:

(a) A statute or treaty of the United States which provides for a national or international registration ... or which specifies a place of filing different from that specified in this article for filing of the security interest;

(4) Compliance with a statute or treaty described in subsection (3)(a) ... is equivalent to the filing of a financing statement under this article, and a security interest in property subject to the statute or treaty can be protected only by compliance therewith ...

The current federal trademark law, commonly referred to as the Lanham Act, is found at 15 U.S.C. § 1051 *et seq.* It is derived from legislation originally enacted in 1946. Section 10 of the Lanham Act, 15 U.S.C. § 1060, provides that:

A registered mark or a mark for which application to register has been filed shall be assignable with the goodwill of the business in which the mark is used, or with that part of the goodwill of the business connected with the use of and symbolized by the mark, and in any such assignment it shall not be necessary to include the goodwill of the business connected with the use of and symbolized by any other mark used in the business or by the name or style under which the business is conducted. Assignments shall be by instruments in writing duly executed. Acknowledgment shall be prima facie evidence of the execution of an assignment and when recorded in the Patent and Trademark Office the record shall be prima facie evidence of execution. An assignment shall be void as against any subsequent purchaser for a valuable consideration without notice, unless it is recorded in the Patent and Trademark Office within three months after the date thereof or prior to such subsequent purchase. A separate record of assignments submitted for recording hereunder shall be maintained in the Patent and Trademark Office.

Additionally, Rule 2.185, promulgated by the Commissioner of Patents, provides that:

(a) Assignments under section 10 of the act of registered marks, or marks for which an application for registration has been filed, will be recorded in the Patent and Trademark Office. *Other instruments which may relate to such marks may be recorded in the discretion of the Commissioner.*

37 C.F.R. § 2.185 (1984) (emphasis added). The question, therefore, is whether 15 U.S.C. § 1060 is a statute which "specifies a place of filing for a security interest different" from that in the Uniform Commercial Code. For the reasons set forth below, this court concludes that the Lanham Act does not do so.

Trademark cases distinguish between security interests and assignments. E.g., *Li'l' Red Barn, Inc. v. Red Barn System, Inc.*, 322 F.Supp. 98 (N.D.Ind. 1970), *aff'd per curiam*, 174 U.S.P.Q. 193 (7th Cir.1972). An "assignment" of a trademark is an absolute transfer of the entire right, title and interest to the trademark. "In order for a transfer of rights in a trademark to constitute a sale or assignment, thereby vesting title to the trademark in a party, the transfer must be absolute and must relate to the entire rights in the trademark." *Acme Valve & Fitting Company v. Wayne*, 386 F.Supp. 1162, 1165 (S.D.Tex.1974). The grant of a security interest is not such a transfer. It is merely what the term suggests—a device to secure an indebtedness. It is a mere agreement to assign in the event of a default by the debtor. "[T]he rule is well established that a mere agreement for the future assignment of a trademark is not an assignment of either the mark itself or the good will attached to it." *Li'l' Red Barn* at 107; *accord, SMI Industries Canada Ltd. v. Caelter Industries, Inc.*, 586 F.Supp. 808 (N.D.N.Y.1984). Since a security interest in a trademark is not equivalent to an assignment, the filing of a security interest is not covered by the Lanham Act. Accordingly, the manner of perfecting a security interest in trademarks is governed by Article 9 and not by the Lanham Act.[2]

Rule 2.185 which provides that "[o]ther instruments which relate to such marks may be recorded in the discretion of the Commissioner" does not require a different result. Initially, it is to be noted that the recordation of other instruments relating to marks is permissive only. More importantly, the regulation is invalid, if in fact it intended to suggest that a security interest is embraced within the term "assignment" and therefore subject to filing under the Lanham Act. Section 1123 of title 15 states that "The Commissioner shall make rules and regulations, not inconsistent with law, for the conduct of proceedings in the Patent and Trade Mark Office." Rules promulgated by a governmental agency are subject to the limitations imposed by the specific legislation pursuant to which the regulations are issued.

The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law—for no such power can be delegated by Congress—but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute.. A regulation which does not do this, but operates to create a rule out of harmony with the statute is a mere nullity.... And not only must a regulation, in order to be valid be consistent with the statute, but it must be reasonable.... ... The regulation constitutes only a step in the

---

**2.** Bernstein and Patinkin advance the following opinion in their article *Perfection of Security Interests in Patents, Copyrights and Trademarks:*

A grant of a security interest does not normally confer on the secured party the present right to use the trademark in the business of the debtor and thus may not be the type of an "assignment" (i.e., a sale or license) which is subject to 15 U.S.C. § 1060. (cf. 1 J. Thomas McCarthy, Trademarks and Unfair Competition 608 (1973); *Li'l Red Barn v. Red Barn System, Inc.*, 322 F.Supp. 98 (N.D.Ind.1970), *aff. per cur.*, 174 U.S. Pat. Quarterly 193 (7th Cir.1970).) Arguably, therefore, a security interest in a trademark need not be perfected in accordance with the federal trademark statute. Instead, perfection should be accomplished pursuant to Article 9 of the UCC.

The Practicing Law Institute Coursebook, No. 175, A4–2099, Personal Property Under the Revised U.C.C., p. 71–95 at 83 (1979).

Article I, section 8 of the United States Constitution confers upon Congress the power "to promote the program of science and useful arts, by securing for limited times for authors and inventors the exclusive right to their respective writings and discoveries." Congress accordingly has the exclusive control over the regulation of patents and copyrights. The Constitution, however, does not confer upon Congress similar control over trade-marks. *See Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 232, 84 S.Ct. 784, 789, 11 L.Ed.2d 661 (1964).

Many states have adopted their own trademark statutes and at least forty states have adopted the Model Trademark Act. Bramson, *Intellectual Property as Collateral—Patent, Trade Secrets, Trademarks and Copyrights*, 36 Bus. Law. 1567, 1572 (1981). The perfection of a security interest under a state act is governed by Article 9 unless the state act provides its own method of perfection.

administrative process. It does not, and could not, alter the statute.

*Manhattan General Equipment Co. v. Commissioner of Internal Revenue*, 297 U.S. 129, 134, 56 S.Ct. 397, 399, 80 L.Ed. 528, *reh'g denied* 297 U.S. 728, 56 S.Ct. 587, 80 L.Ed. 1010 (1936). Since the Lanham Act provides merely for the filing of assignments, the attempt to provide for the filing of other documents has no legal effect.

The Official Comment to section 9104 of the Uniform Commercial Code is also illuminating. The Comment states that the filing provisions contained in the Federal Copyright Act, 17 U.S.C. §§ 28, 30 (current version 17 U.S.C. § 205 (1982)) and the Patent Act, 35 U.S.C. § 47 (current version 35 U.S.C. § 261 (1982)) "are recognized as the equivalent" to filing under Article 9. The failure to include the Trademark Act in the Comment suggests that the drafters of the Uniform Commercial Code were of the opinion that the reference to "assignments" in the Lanham Act did not embrace security interests. A similar inference may be drawn from an examination of Professor G. Gilmore's comprehensive and scholarly treatise, *Security Interests in Personal Property* (1965). Professor Gilmore devotes a chapter to a discussion of the perfection of security interests subject to federal statutes. *Id.*, § 13.1–13.7 at 401–434. Nowhere in that chapter is there any reference to the Lanham Act nor any requirement that a security interest in trademarks is to be perfected under federal law.

The Uniform Commercial Code provides a simple mechanism for obtaining and perfecting security interests in personal property. Understandably, the Code defers to federal legislation if such legislation accomplishes the same purpose. However, unless federal preemption is clearly established, the Code procedures should continue to apply. Commentators who address the question admit that 15 U.S.C. § 1060 presents problems of construction and does not clearly establish a method for perfecting a security interest in trademarks. Bernstein and Patinkin, *supra* note 2, at 82–83; Bramson, *supra* note 2, at 1578–1579, 1590–1595; 3 R. Callmann, *Unfair*

*Competition, Trademarks and Monopolies*, § 19.62 p. 247–249 (L. Altman 4th ed. 1983); B. Clark, *The Law of Secured Transactions*, ¶ 1.8(1)(e), p. 1–48, n. 159 (1980); Handler and Lin, *How to Perfect Security Interests in Patents, Trademarks and Copyrights*, 11 U.C.C.L.J. 346, 351–353 (1978). Some commentators simply beg the question. For example, B. Clark, states that the Lanham Act *"clearly preempt[s] the UCC with respect to perfection if a security interest is considered a Lanham Act 'assignment.'"* B. Clark, *supra* (emphasis added). J. McCarthy, in his treatise on trademarks and unfair competition states: "Until either the UCC or the Lanham Act is clarified the courts should treat either federal or state recordation of a conditional security assignment as sufficient to perfect such a security." 1 J. McCarthy, *supra* p. 943, § 18:1(G) at 797. Bernstein and Patinkin advise a similar approach:

> Although it appears that perfection of a security interest in a trademark is governed by the UCC, it is nevertheless recommended that if a particular trademark is otherwise subject to the federal trademark statute, the secured party should also record a document with the Patent and Trademark Office, in accordance with the procedures set forth in 15 U.S.C. § 1060, describing the secured party's security interest.

Bernstein and Patinkin, *supra* note 2, at 85. Not only is there lack of agreement as to whether section 1060 provides for the recordation of security interests with respect to trademarks but, additionally, the commentators who assume that a Lanham Act filing is required, do not agree as to what documents are to be filed. Some commentators suggest that the filing of a conditional or collateral assignment suffices. Bramson, *supra* note 2, at 1593–1594 (collateral assignment); 1 J. McCarthy, *supra* p. 943, § 18.1(G) at 797. Others suggest that the creditor, in addition to the filing of a conditional assignment, must file a security agreement. Handler and Lin, *supra* p. 945, at 352–353. At least one

commentator suggests a more complicated procedure:

> One approach, therefore, would be an agreement to assign the trademarks in the future, conditioned upon a default as defined in the underlying security agreement. This agreement to assign can be part of the mortgage indenture (or, as Article 9 of the Uniform Commercial Code calls it, "security agreement") and can also include an irrevocable power of attorney to the mortgagee or "secured party" to execute the assignment on behalf of the debtor in the event of a default, should the latter fail or refuse to execute and deliver the assignment.
>
> Such a security agreement to assign should be recorded in the United States Patent and Trademark Office so that third parties would be put on notice that the debtor's trademarks are subject to a security interest or lien under the agreement.

3 R. Callmann, *supra* p. 945, § 19.63, at 241. All commentators apparently agree that the relationship between 15 U.S.C. § 1060 and Article 9 "is an extremely treacherous area, one where the fit ... is uneasy at best." B. Clark, *supra* p. 945. Given this uncertainty, there is no justification for holding that Code-perfected security interests are not valid.

The terms "assignment" and "security interest" are terms of art with distinct and different meanings. If Congress intended to provide a means for recording security interests in trademarks in addition to assignments, it would have been simple to so state. However, for whatever reasons, Congress did not do so. A plausible reason surfaces. Congress was concerned with protecting the public from the deceptive use of trademarks. See discussion *infra* p. 946. A security interest in a mark does not grant the secured creditor the right to use the mark absent default by the debtor. A security interest in a trademark, therefore, cannot lead to public deception. Thus, there was no reason to provide for the filing of security interests. It may be

3. The same result has been reached in *In re TR–3 Industries,* 41 B.R. 128 (Bankr.C.D.Cal.

that all transactions with respect to federally registered trademarks should be controlled by federal law. However, it is not for a court to adopt a policy not spelled out in the legislation it is construing. For the foregoing reasons, the Article 9 filing perfected NAC's security interest in the collateral which included the debtor's trademarks, formulas, and customer lists.[3]

The trustee additionally contends that NAC's security interest is void and unenforceable as a matter of federal trademark law. He maintains that in order to have a valid and enforceable security in a trademark, the secured party must also have a corresponding interest in the machinery and equipment necessary to produce the products to which the marks attach. Since NAC had released whatever interest it had in the machinery and equipment, the trustee concludes that NAC's security interest in the trademark is unenforceable. This contention has no merit.

■ Section 10 of the Lanham Act, 15 U.S.C. § 1060 provides, in pertinent part, that:

> A registered mark or a mark for which application to register has been filed shall be assignable with the goodwill of the business in which the mark is used, or with that part of the goodwill of the business connected with the use of and symbolized by the mark. . . .

A purpose of the Act is "to protect the public so it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get." Sen.Rep. No. 1333, 79th Cong. 2d Sess. p. 3 (1946); *see also, Inwood Laboratories, Inc. v. Ives Laboratories, Inc.,* 456 U.S. 844, 854 n. 14, 102 S.Ct. 2182, 2188 n. 14, 72 L.Ed.2d 606 (1984); *H.H. Scott, Inc. v. Annapolis Electroacoustic Corp.,* 195 F.Supp. 208, 215 (D.Md.1961); *Pepsico, Inc. v. Grapette Company, Inc.,* 416 F.2d 285 (8th Cir.1969).

1984), a case published after this opinion was issued.

■ To be valid, an assignment of a mark must be accompanied by an assignment of the goodwill of the business.

Good will and its symbol, a trademark, are inseparable. A trademark has no independent significance apart from the good will it symbolizes. If there is no business and no good will, a trademark symbolizes nothing. For this reason, a trademark cannot be sold or assigned apart from the good will it symbolizes. 1 J. McCarthy, *supra* p. 943, § 2:8 at p. 76. A trustee in bankruptcy may assign a trademark. *See e.g., American Dirigold Corp. v. Dirigold Metals Corp.*, 125 F.2d 446, 453 (6th Cir.1942). The question, therefore, is whether the transfer of the trademarks, formulas, and customer lists to Michlin by the trustee, without a simultaneous transfer of other assets of the debtor's business, was a valid assignment.

■ The requirement that goodwill accompany the assignment of a mark is to insure that the mark will continue to be connected with substantially the same products with which the mark has become associated. "The situation sought to be avoided is customer deception resulting from abrupt and radical changes in the nature and quality of the goods or services after the assignment of the mark." 1 J. McCarthy, *supra* p. 943, § 18:2 at 800.

> The test is not one of quantity, but of quality, looking at the nature and the relationship of the transferred assets to that type of business. *For example, even if no physical assets are sold, but technical information and know-how together with customer lists are transferred, goodwill may very well pass to the buyer and support a trademark assignment. Syntex Laboratories, Inc. v. Norwich Pharmacal Co.* (1970 SDNY) 315 F.Supp. 45, 166 USPQ 312, aff'd on other grounds (CA2 NY) 437 F.2d 566, 169 USPQ 1 (held good will passed to support trademark assignment). Thus where products are made according to a secret formula or a patent these may constitute "good will" which must be transferred to the assignee of the mark.

1 J. McCarthy, *supra* p. 943, § 18:7 at 812 (emphasis added; other citations omitted). The requirement that a mark cannot be assigned in gross but must be accompanied by the goodwill of the business does not mean that any specific assets have to be transferred with the trademark. Grismore, *The Assignment of Trademarks and Trade Names*, 30 Mich.L.Rev. 489–503 (1932). In fact, it has been held there can be a valid assignment of a trademark and good will without the simultaneous transfer of any tangible assets of the business. E.g., *Hy-Cross Hatchery, Inc. v. Osborne*, 303 F.2d 947, 49 CCPA 1163 (1962); *Sterling Brewers, Inc. v. Schenley Industries, Inc.*, 441 F.2d 675, 58 CCPA 1172 (1971); *Glamorene Products Co. v. The Procter & Gamble Co.*, 538 F.2d 894 (C.C.P.A.1976); *Visa, U.S.A., Inc. v. Birmingham Trust Nat'l. Bank*, 696 F.2d 1371 (Fed.Cir.1982), *cert. denied,* —— U.S. ——, 104 S.Ct. 98, 78 L.Ed.2d 104 (1983); *Money Store v. Harriscorp Finance, Inc.*, 689 F.2d 666 (7th Cir.1982). To determine whether an assignment of a trademark is valid, the proper focus is on "the nature of the assignee's use, not the formalism of what assets passed to the assignee." 1 J. McCarthy, *supra* p. 943, § 18:2 at 801. The trademarks, formulas and customer lists were transferred to a corporation which intended to manufacture the same products in accordance with the same formulas with which the marks had become associated in the public mind. No purpose served by section 1060 is frustrated by the assignment. The transfer of the trademarks to Michlin is, therefore, valid.

The trustee relies on *Haymaker Sports, Inc. v. Turian*, 581 F.2d 257 (C.C.P.A. 1978). The case is clearly distinguishable on its facts. Moreover, to the extent that *Haymaker* holds that an assignment of a mark is invalid unless the assignee also succeeds to all assets both tangible and intangible of the business with which it was associated, it is not persuasive for the reasons set forth above.

Neither the trustee nor Patterson question that NAC has a valid and perfected security interest in the formulas and cus-

tomer lists. NAC, therefore, had a perfected security interest in the assets sold to Michlin. NAC's security interest is not subject to attack by the trustee as an assignment in gross.[4]

Moreover, it is questionable whether the trustee should be allowed to raise this defense. The trustee, by the transfer to Michlin, conveyed both the estate's and NAC's interests in the debtor's trademarks, formulas and customer lists. The trustee does not allege that the transfer to Michlin was invalid as an assignment in gross, conceding by implication the validity of the transfer. If the trustee's assignment of the marks was valid, there is no basis for challenging NAC's security interest as an invalid assignment.

An appropriate order is to be submitted for entry.

---

**4.** While the security interest prior to default is not an assignment upon default, if the creditor enforces his security interest "it then becomes an operative assignment" and thus subject to compliance with section 1060. 1 J. McCarthy, *supra* p. ——, § 18:1 at 796.