In re Billy Gene MAYFIELD, d/b/a Mayfield Egg Company, Debtor.

C. Kenneth STILL, Trustee, Plaintiff,

v.

CAL-MAINE FOODS, INC., Defendant.

Bankruptcy No. 1-81-01341.
Adv. No. 1-82-0400.

United States Bankruptcy Court,
E.D. Tennessee.

July 22, 1983.

Scott N. Brown, Jr., Brown & Dobson, Chattanooga, Tenn., for plaintiff.

Robert S. Peters, Swafford, Peters, & O'Neal, Winchester, Tenn., for defendant.

## MEMORANDUM

RALPH H. KELLEY, Bankruptcy Judge.

The question in this proceeding is whether the defendant, Cal-Maine Foods, had a perfected lien on a feed mill and related goods owned by Billy Gene Mayfield at the time of his bankruptcy.

The feed mill was located on real property belonging to the Louisville and Nashville Railroad Company and leased to Mayfield. Mayfield bought the mill from Cal-Maine on credit. To secure payment of the price, Mayfield executed a deed of trust giving Cal-Maine a lien on his leasehold interest in the real property and a security agreement giving Cal-Maine a security interest in the feed mill equipment, the office equipment and furniture, a Chevrolet truck, and 150 egg dollies.

Cal-Maine did not file Uniform Commercial Code (UCC) financing statements before Mayfield's bankruptcy. Cal-Maine could have perfected its security interest in the office equipment and furniture and the egg dollies only by filing a financing statement. Tenn.Code Ann. § 47–9–302. The failure to file left Cal-Maine's security interest in those goods unperfected at the time of bankruptcy and inferior to the rights of the bankruptcy trustee under § 544(a) of the Bankruptcy Code. Tenn. Code Ann. 47–9–301(1)(b) & (3).

Cal-Maine's failure to file a financing statement also prevented perfection of its security interest in the feed mill equipment. Cal-Maine contends, however, that the recording of the deed of trust gave it a perfected lien on the equipment as "fixtures". The main question in this proceeding is which items of the feed mill equipment were fixtures. In addition to the above facts, the court finds the following facts.

The mill was installed about 1969 in a building that was not built specially for the mill but was modified to accommodate it. The land was and still is owned by the Louisville and Nashville Railroad Company, which has leased the premises to the mill operators.

In 1979 Mayfield bought the mill from Cal-Maine for a price of about $100,000.00 to be paid in 60 monthly installments. The court has already pointed out the agreements as to security for the debt and the effect of Cal-Maine's failure to perfect its UCC security interest.

In December, 1979, Mayfield and the railroad executed a lease of the real property. The lease was for five years at a rental of $2,000 per year. Mayfield had the option of extending the lease for five more years by giving notice and on condition that he and the railroad could agree on a new rental. The lease could also be extended after the first extension, but either party could terminate it by giving thirty days' notice.

Paragraph No. 22 of the lease provided:

ADAMS FEED MILLS, Division of Cal-Maine Foods, Inc., a Delaware corporation, is hereby made a party to this contract for the sole purpose of agreeing and does hereby agree that this contract cancels and supersedes contract dated July 7, 1969, between Railroad and ADAMS FEED MILLS, Division of Cal-Main Foods, Inc., covering lease of land and use of trackage herein provided.

Fred Adams, the president of Cal-Maine Foods, testified that the company had nine mills on property leased from the railroad for ten to fifteen years and had no trouble obtaining lease renewals. He also testified that the railroad's tendency was to ask for

shorter leases, such as the five year lease to Mayfield. Apparently, the railroad leased the property to Adams Feed Mills for an original term of ten years, though that is not clear from the record.

Paragraph No. 6 of the lease to Mayfield provided:

Within sixty (60) days after termination of this lease, the Lessee shall remove any structures or installations placed upon the leased premises by it, and any structures or installations placed upon the leased premises by any former Lessee of the Railroad when the present Lessee has taken title to or made use of such structures or installations, and shall restore the premises to their original condition. In the event the Lessee fails to remove such structures or installations within the sixty (60) day period, the Railroad shall have the option of removing them at the cost of the Lessee, which cost the Lessee agrees to pay, or of allowing them to remain, in which event their title shall vest in the Railroad and the Lessee shall have no further claim to them.

The lease provided that the railroad could terminate it by giving notice to Mayfield if he defaulted in performance and continued in default for thirty days.

Mr. Adams said he knew that removal of the mill was required by the lease. He also testified that the $40,000 offer to buy the mill from the trustee was too low and provoked Cal-Maine to buy the mill for $44,000.

He testified that no one had offered to buy the mill but it should be worth more than $75,000 if a buyer could be found.

Mr. Adams' testimony regarding the mill equipment was as follows. He has built or bought about 16 mills but has never moved one and has never sold any except as a whole. He has closed two nonproductive mills but has not moved them because it would be impractical. This mill cost about $144,000 new. It is semi-automated and has a capacity of 20 tons per hour. The building's foundation is three-feet thick concrete. A steel framework for the machinery is bolted to the concrete foundation. The machinery is bolted or welded to the steel framework. The mill was not de-

signed to be portable and cannot be dismantled with a monkey wrench and a screwdriver. The movable items sold to Cal-Maine were an air compressor, a power shovel, office machines, and 80 egg dollies, worth a total of $3,700.00. It would be impractical to remove the other equipment. The other bidder wanted to move the mill to Mississippi.

Howell Graham also testified regarding the feed mill equipment. He has been in the business of building "material-handling" facilities for 20 years and for the last three years has sold feed mills and supervised their installation. The mill is made of separate items assembled together. The mill could not be moved as a unit. It could be disassembled and the parts moved and then reassembled as a mill. Nothing could be removed without moving something else. The mixers could be removed without removing any part of the building. The equipment is bolted and welded to the braces (the steel framework). A torch would be required to disassemble the equipment from most of the braces. The inside bins are bolted together and would be harder to move than the outside storage tanks. The bins are seldom moved. Much of the value of the mill is in the storage facilities, the bins and the tanks, but especially the bins.

Southland Supply Company built the mill in question. William Shows, Jr., testified that he has worked for Southland Supply since 1953 and has built 10 to 15 mills. With regard to the mill equipment, he testified as follows. This mill was designed specifically for this building. The machinery is welded in spots and bolted in others. A person attempting to remove the mill would have to use a torch and drive out the bolts. The elevator is welded to angle iron. If a part needs replacing, a torch might be required to remove the old part. A new mill like this would cost $300,000 to $335,000. It would cost about $135,000 to move this mill and reassemble it.

Mr. Shows testified as follows regarding specific items of equipment listed on the original contract for construction of the mill.

Item No. 1 is a "truck dump hopper", 4 feet wide by 10 feet long, along with a motorized screw conveyor. Removal of the hopper would require removal of some bolts and cutting it loose with a torch.

Item No. 2 is a motorized elevator, 75 feet high with a ladder and platform. The elevator is welded to angle iron and can be removed by cutting it loose with a torch.

Item No. 3 is a distribution system made up of a "distributor" and ductwork for distributing the flow from the elevator among six different bins. The distributor is bolted to the structural steel.

Item No. 4 is the cluster of six bins. They are apparently mounted above the floor on structural steel so that grain can flow down out of the bins. The six bins are made from four, 8 feet by 8 feet bins, with two of those split into two compartments each. The bins are 24 feet high. They are welded to the structural steel.

The grain from the six bins flows down into a two ton weigh hopper that is 5 feet wide by 10 feet long (Item No. 5). The weigh hopper includes a two ton capacity scale.

Item No. 6 is a "vertical batch mixer, below floor model" capable of mixing 125 cubic feet of feed. The mixer is tied down.

Item No. 7 includes two Butler storage tanks, each 18 feet in diameter by 37½ feet high. They are outside the building. They can be dismantled and the parts marked so that they can be reassembled. They are welded in spots and bolted together. Mr. Shows had moved three tanks during his 30 years in the business.

Item No. 8 is an industrial hammermill. It can be moved.

Item No. 9 is another elevator, 58 feet high.

Item No. 10 is another distribution system from the elevator to the "load-out" bins (Item 11), which include another, larger weigh hopper and scale.

Item No. 12 is the air compressor.

Item No. 13 is a power shovel bolted to the structural steel.

Apparently the cluster of six bins holds the various ingredients to be mixed by the mixer and milled by the hammermill.

### Discussion

The court dealt with a similar problem in the case of *In re Belmont Industries,* 1 B.R. 608 (Bkrtcy.E.D.Tenn.1979). The court held that whether an article is a fixture depends on (1) annexation to the realty, (2) whether the article was intended to be permanently attached to the freehold, and (3) whether the article can be removed without substantial injury to the freehold. See generally J. Gervin, The Law of Fixtures in Tennessee: A Consideration of the Common Law and Fixture-Related Provisions of the Uniform Commercial Code, 42 Tenn.L.Rev. 354 (1975).

It is worthwhile to first consider the relationship of the parties to the lawsuit. The defendant sold the equipment to the debtor and claims a perfected lien by virtue of a recorded deed of trust of the debtor's leasehold interest. The plaintiff as trustee in bankruptcy is in the position of an unsecured creditor that acquired a judgment lien on the debtor's property, including the equipment, without actual notice of any prior liens on the property. The question, then, is whether the recorded deed of trust should be treated as record notice to a subsequent judgment lien creditor of a lien on the equipment. The answer depends on whether a subsequent judgment lien creditor would reasonably expect the equipment to be a permanent improvement to the mortgaged realty and thus subject to any real estate mortgages. This is slightly different from saying that the question is whether a subsequent real estate mortgagee would expect the equipment to be included in the realty but should in most cases lead to the same result. J. Gervin, supra, 42 Tenn.L.Rev. 354, 377 (1975).

The degree of attachment and the removability of the equipment should be the most important facts, but all the surrounding circumstances likely to come to the judgment creditor's attention should be considered. For example, the equipment in

question was annexed to real property that did not belong to the owner of the equipment but was leased from the railroad. As a general rule, equipment installed by a lessee for trade or business purposes does not become a fixture. See *Cubbins v. Ayres,* 72 Tenn. 329 (1880); *McDavid v. Wood,* 52 Tenn. 95 (1871).

On the other hand, the lessee, Mayfield, did not install this equipment. It was installed about ten years earlier by the seller, Cal-Maine, whose subsidiary leased the property and operated the mill during that time. Assuming a judgment creditor could discover this, he might also discover that the rent was only $2,000 per year.

The court does not doubt that most of the equipment can be moved. The lease required its removal by Mayfield or at his expense on termination of the lease, without regard to whether the lease was terminated because of Mayfield's default. However, the lease also allowed the railroad to keep the equipment on termination of the lease. This lease points in both directions on the question of whether the equipment was considered a permanent addition to the realty. Furthermore, a lease can require removal of goods that are fixtures, even if their removal would cause material damage to the real property. It is, after all, the lessor's real property.

There was essentially no evidence as to what would be the condition of the building or its suitability for other uses if the equipment were removed.

There was little evidence concerning the extent of modifications required to make the building accommodate the mill. A steel framework for the equipment was added inside the building. The construction specifications also suggest that openings were cut in the walls and that some equipment was attached directly to the support walls, but this is not clear from the witnesses' testimony or the photographic exhibits.

The court does not doubt that in many industries most of the equipment simply rests on the floor or is bolted to the floor or walls and can be easily removed by disconnecting electrical and plumbing connections. That was essentially the situation in the *Belmont Industries* case decided by this court and in a case decided by Bankruptcy Judge Clive Bare also of this district. *In re Regency Furniture, Inc.,* 7 U.C.C.Rep.Serv. 1384 (Bkcy.E.D.Tenn.1970). The "exigencies of trade" have also demanded a liberal view of removability of goods used in manufacturing by a lessee of the real property. *Cubbins v. Ayres,* 72 Tenn. 329 (1880).

The equipment in question is connected to a substantial steel framework erected within the building. The equipment is both welded and bolted to the framework. The separate pieces of equipment are generally bolted, welded, or otherwise connected to each other to form a mill in which various ingredients can be put in at the beginning and will be sorted, weighed, moved, and milled mostly by the machines and will come out as animal feed. The size of the structure, especially the inside bins, suggests their permanent attachment to the building. Certainly a person viewing the equipment inside the building would consider most of it attached to the building until obsolescence, or "permanently" attached.

The difficulty of removing the equipment in question distinguishes this case from *In re Regency Furniture,* cited above, and the following cases. *In re Factory Homes Corporation,* 333 F.Supp. 126, 9 U.C.C.Rep.Serv. (W.D.Ark.1971); *In re Boden Mining Corp.,* 11 B.R. 562, 33 U.C.C.Rep.Serv. 1550 (Bkrtcy.S.D.W.Va.1981).

The outside storage tanks are movable. Apparently they are of a kind often used on farms and generally considered movable, though these are bigger. See *Harry J. Whelchel Company v. King,* 610 S.W.2d 710 (Tenn.1980). These, however, are not located on a farm. They are part of an industrial plant that had been in place for about 12 years at the time of the owner bankruptcy. See *Corning Bank v. Bank of Rector,* 265 Ark. 68, 576 S.W.2d 949, 26 U.C.C.Rep.Serv. 1367 (1979). The court concludes that the outside storage tanks should also be considered fixtures.

The court concludes that the movable items valued by Mr. Adams at $3,700.00

were equipment, not fixtures. The trustee is entitled to their value since his lien rights are superior to Cal-Maine's unperfected UCC security interest. The court concludes that, except for two, the remaining items of equipment are fixtures. The evidence leaves the court in doubt as to the two items remaining in question, the hammermill and the mixer. The court will reopen the evidence as to these two items only. A hearing will be set and no final order will be entered until then.

One legal question remains. The plaintiff suggested that Cal-Maine's lien on Mayfield's leasehold interest did not give it a lien on fixtures, apparently because fixtures would be considered part of the railroad's freehold, rather than Mayfield's leasehold. Between Mayfield and the railroad, however, their rights to the equipment were controlled by the lease, which essentially recognized Mayfield's ownership of the equipment and his right to remove it whether or not it was a fixture. The mortgage of the leasehold to Cal-Maine put it in the same position as Mayfield as to the fixture equipment. Thus, the deed of trust gave Cal-Maine a lien on the equipment.

The parties will be allowed twenty days to see if they can draw an agreed order in accordance with this memorandum. If not, a further hearing will be held at 10:00 a.m. on the 12th day of September, 1983, in Room 305, U.S. Post Office and Courthouse, Winchester, Tennessee.

This memorandum constitutes findings of fact and conclusions of law. Bankruptcy Rule 752.