### In re CHATTANOOGA CHOO–CHOO COMPANY, Debtor.

#### Bankruptcy No. 1–87–02494.

United States Bankruptcy Court,
E.D. Tennessee.

April 5, 1989.

Richard C. Kennedy of Kennedy, Fulton, & Koontz, Chattanooga, Tenn., for debtor.

Douglas R. Johnson of Hall, Haynes, Lusk & Foster, Chattanooga, Tenn., for trustee, William M. Foster.

John Gupton of Schulman, LeRoy & Bennett, Nashville, Tenn., for Equitable Life Assurance Society.

Richard B. Gossett & James A. Fields of Heiskell, Donelson, Bearman, Adams, Williams & Kirsch, Chattanooga, Tenn., for American Nat. Bank and First Tennessee Bank.

F. Scott Leroy of Spears, Moore, Rebman & Williams, Chattanooga, Tenn., for Pioneer Bank.

Richard P. Jahn, Jr. of Jahn, Jahn & Cavett, Chattanooga, Tenn., for Merchants Nat. Bank (MNB).

## MEMORANDUM

RALPH H. KELLEY, Chief Judge.

The Chattanooga Choo–Choo Company operated a large hotel, convention center, and retail complex in Chattanooga, Tennessee. The Choo–Choo operated for about a year during a chapter 11 reorganization case without a confirmed plan of reorganization. A bankruptcy trustee was appointed and sold all the property as a going business to Choo–Choo Partners, a limited

partnership. All mortgages, security interests, and other liens attached to the proceeds. The court must now determine how to divide the proceeds among the secured creditors and the bankruptcy trustee.

Equitable Life Assurance Society had the first mortgage on the Choo–Choo's real property and the first security interest in its personal property. The other parties with claims to the property are the bankruptcy trustee, American National Bank by itself, American National Bank and First Tennessee Bank jointly, Pioneer Bank, and Merchants National Bank. If Equitable's first mortgage and security interest are the first in priority on all the property, both real and personal, then Equitable is entitled to all the sale proceeds, and the other parties are entitled to none. The other parties have attempted to prove that they are entitled to some of the sale proceeds ahead of Equitable. Their arguments are as follows:

(1) American National Bank took a second mortgage on the real property known as the ice rink, but its second mortgage had first priority because Equitable agreed to subordinate its first mortgage.

(2) Pioneer Bank's mortgage on tract 5 of the real property had first priority because the earlier mortgages did not apply to tract 5.

(3) Pioneer Bank had the highest priority security interest in three or four vehicles because it perfected security interests by notation on the title certificates and no other creditor did so.

(4) The trustee in bankruptcy is entitled to the proceeds from three vehicles that were not subject to any perfected security interests.

(5) Merchants National Bank had the highest priority security interest in the hotel telephone system because it had purchase money priority or its financing statement was the first one filed and which had not lapsed before the Choo–Choo's chapter 11 case.

(6) The trustee in bankruptcy is entitled to the portion of the sale proceeds that can be attributed to the Choo–Choo's registered service mark because no one had a perfected security interest in it.

(7) American National Bank and First Tennessee are the joint holders of the third security interest in the Choo–Choo's personal property, but the security interest has priority over Equitable's first and second security interest because (a) the financing statement filed to perfect Equitable's first security interest lapsed as a result of Equitable's failure to file a continuation statement and (b) Equitable's second security interest was not perfected by filing a financing statement until after the banks had perfected their security interest.

As to numbers 1 through 5 above, priority is not in dispute, but the court must determine the value of the ice rink, tract 5, the vehicles, and the telephone system so that the trustee and the secured creditors can be paid the correct amounts from the sale proceeds.

Number 6 may include not only the question of whether anyone has a perfected security interest in the registered service mark but also the question of its value. The valuation problem, if it arises, will have to be postponed until after a decision on the legal issues raised in number 7.

Number 7 deals with the question of priority between Equitable's first security interest in personal property and the security interest belonging jointly to American National Bank and First Tennessee Bank. If the banks prove that their security interest has priority, then the court will be faced with two questions. First, what property is purely personal property and what property is a fixture? The proceeds of property that is a fixture will be paid to Equitable even if the banks' security interest has priority over Equitable's. Tenn. Code Ann. § 47–9–313(3) & (4) (1979). Second, what is the value of all the personal property—excluding the fixtures, the vehicles that were claimed by Pioneer Bank and the trustee, the telephone system, and the service mark (assuming the trustee pre-

vails on his claim to the proceeds of the service mark)?

Since the court may have to do a general valuation of all personal property, the court must postpone valuation of the service mark until after ruling on the priority dispute between Equitable and the banks.

The court will deal with the issues in the same order as above.

### The Ice Rink

American National Bank had the first priority claim to the real property known as the ice rink as a result of Equitable's subordination of its first mortgage. Thus, American National Bank is entitled to be paid first out of the sale proceeds, and Equitable is entitled to the remainder.

The court need not determine the exact value of the property. American National's claim is about $40,000. The property is worth about $300,000. No one has disputed American National's right under Bankruptcy Code § 506 to add interest that accrued during the Choo–Choo's chapter 11 case plus reasonable attorney's fees and costs of collection. 11 U.S.C.A. § 506(b) (Supp.1989). Though the exact amounts have not been calculated, the total will not be anywhere near $300,000. The court leaves the amounts to be calculated later. Suffice it to say that American National is entitled to collect interest plus reasonable attorney's fees and costs under Bankruptcy Code § 506.

### Tract 5

Pioneer Bank had the first claim to tract 5 and is entitled to the sale proceeds. The parties agreed that the value of the property was $25,500. Pioneer Bank is entitled to this amount. Since it is considerably less than the debt, Pioneer is not entitled under § 506(b) to attorney's fees, expenses, or interest.

### Vehicles

The parties agreed that Pioneer Bank had the first security interest in three vehicles and that the vehicles were worth $27,000. Pioneer is entitled to $27,000 as the proceeds from their sale.

As to the fourth vehicle, an International truck, there was an unsettled dispute between Pioneer Bank and the bankruptcy trustee. The truck is worth $2,000 to $4,000 according to the appraisals. The higher amount—$4,000—must be retained from any distribution to creditors in order to pay the trustee or Pioneer Bank once the dispute is settled. The court does not find that the truck is worth $4,000; that is simply the maximum amount that must be retained to pay Pioneer Bank or the trustee.

Three other vehicles were not subject to any perfected security interest. The parties conceded that the trustee is entitled to the proceeds of their sale. The vehicles were appraised as follows:

| | |
|---|---|
| Chevrolet Trash Truck | $7,500 to $10,000 |
| Dodge Pick-up | $ 900 to $ 2,000 |
| For Dump Truck | $ 500 |

The appraisers were not hired by the trustee, and both appraisals were done on the same basis, market value rather than going concern value. The court accepts the average of the appraisals on the Chevrolet and the Dodge—$8,750 and $1,450. There is only one appraisal of the Ford at $500. Thus, the trustee is entitled to a total of $10,700 as the proceeds of these vehicles.

### The Telephone System

The parties agreed that Merchants National Bank has the first priority claim to the Hitachi Ex-10 telephone system, but the court agreed to withhold a ruling on valuation in order to allow negotiation.

### The Service Mark

The trustee alleged that no one had a perfected security interest in the service mark because no one perfected by registering under the federal statutes providing for the registration of trademarks, service marks, etc.

Thisr aises the question of whether the federal statute or Tennessee's version of Article 9 of the Uniform Commercial Code (UCC) controlled perfection of a security interest in the service mark.

The older version of UCC § 9–302 says that Article 9 does not govern perfection of a security interest when a federal statute provides for national registration of security interests. Tenn.Code Ann.

§ 47–9–302(3) (1979). The newer version of 9–302 says that perfection of a security interest is not governed by Article 9 when a federal statute provides for national registration. Tenn.Code Ann. § 47–9–302(3) (Supp.1988). The newer statute, unlike the older statute, does not clearly say that the federal statute must provide for national registration of security interests. It could possibly include a federal statute that provides for national registration of ownership.

However, the change in the wording of § 9–302 apparently was not intended to change the law. The drafters of the newer version commented, "The cases recognized are those where suitable alternative systems for giving public notice of a security interest are available." U.C.C. § 9–302, Draftsmen's Comment to 1972 Official Text. The drafters' comment on the change said only that the reference to the federal statutes had been broadened to include treaties. U.C.C. 9–302, Draftsmen's Statement of Reasons for 1972 Changes in Official Text. The court concludes that perfection of a security interest in the service mark was governed by Tennessee's version of UCC Article 9.

The court has found three cases that all agree: Article 9 of the UCC, not the federal statute, governs perfection of a security interest in a trademark or other mark subject to registration under the federal statute, because the federal statute provides only for registration of ownership and was not intended to provide notice of security interests. *In re C.C. & Co., Inc.,* 86 B.R. 485, 6 UCC Rep.2d 915 (Bankr.E.D.Va. 1988); *In re Roman Cleanser Co.,* 43 B.R. 940, 39 UCC Rep. 1770 (Bankr.E.D.Mich. 1984); *In re TR–3 Industries,* 41 B.R. 128, 39 UCC Rep. 279 (Bankr.C.D.Calif.1984).

The service mark is a general intangible under Article 9's classification of collateral. Tenn.Code Ann. § 47–9–106 (1979 & Supp. 1988); *In re C.C. & Co., Inc.,* 86 B.R. 485, 6 UCC Rep.2d 915 (Bankr.E.D.Va.1988).

Under Article 9, perfection of a security interest in a general intangible requires filing a financing statement with the secretary of state, and the financing statement must describe the collateral to include the general intangible. Tenn.Code Ann. §§ 47–9–302, 47–9–401, & 47–9–402 (1979 & Supp. 1988). The security interest won't be perfected if the security agreement describes the collateral to include the general intangible, but the financing statement doesn't. See, e.g., *In re American Home Furnishings Corp.,* 48 B.R. 905, 41 UCC Rep. 631 (Bankr.W.D.Wash.1985); *In re Sportsland, Inc.,* 17 UCC Rep. 1333 (Bankr.D.Mass. 1975); *In re Levine,* 6 UCC Rep. 238 (Bankr.D.Conn.1969).

Thus, to determine if anyone had a perfected security interest in the service mark, the court must examine the collateral descriptions in the financing statements that were on file with the secretary of state.

The court is not concerned with those financing statements that apply only to specific items, such as the financing statement filed by Merchants National Bank to cover the telephone system. There are four financing statements that cover a broad range of personal property. They were filed in the following order:

| | |
|---|---|
| Equitable | 1976 |
| American National & First Tennessee Bank | 1981 |
| Equitable | 1982 |
| Pioneer Bank | 1985 |

■ Equitable's 1976 financing statement described the collateral as follows:

All Debtor's machinery, equipment, furniture, furnishings, fixtures, and appliances ... including without limitation restaurant, convention hall, shop, and hotel heating, ventilating and airconditioning equipment, furniture, furnishings, fixtures and appliances, museum and tourist attraction goods, artifacts, displays, signs, rails, railway cars, refrigeration equipment, pool and tennis equipment and furnishings, and all other items located at Debtor's place of business....

Nothing in this description of the collateral covers an intangible asset such as the service mark.

The financing statement filed to perfect the security interest of American National Bank and First Tennessee Bank was filed in February, 1981, by the Industrial Devel-

opment Board. It shows the banks as the board's assignee. The description of the collateral was:

All machinery, apparatus, equipment, fittings and fixtures ... including all trade, domestic and ornamental fixtures, and articles of personal property of every kind and nature whatsoever now or hereafter located in, upon or under said Property ... including, but without limiting the generality of the foregoing, all heating, air conditioning, freezing, lighting, laundry, incinerating and power equipment; engines; pipes; pumps; tanks; motors; conduits; switchboards; plumbing, lifting, cleaning, fire prevention, fire extinguishing; refrigerating, ventilating and communications apparatus, vacuum cleaning systems; elevators; escalators; shades, awnings; screens; oven, ranges, surface units and disposals; attached cabinets; partitions; ducts and compressors; rugs and carpets; draperies; furniture and furnishings of the type customarily located in commercial, institutional and industrial buildings; and those items set forth on page 2 of this *Exhibit B;* together with all additions thereto and replacements thereof.

AND any and all rents, security deposits, issues and profits ... from the Property....

....

All documents, instruments and contract rights relating to the construction of the improvements now or hereafter located on the real estate....

All decorative lighting fixtures and equipment and theatre seating and theatre equipment located on the real estate....

This financing statement may cover some intangible personal property but not the service mark.

Equitable's financing statement filed in 1982 describes the collateral as follows:

All machinery, apparatus, equipment, fittings, fixtures, and articles of personal property of every kind and nature whatsoever, other than consumable goods, now or hereafter located in or upon the real estate ... including, but without limiting the generality of the foregoing, all heating, lighting, laundry incinerating, and power equipment, engines, pipes, pumps, tanks, motors, conduits, switchboards, plumbing, lifting, cleaning, fire-prevention, fire extinguishing, refrigerating, ventilating, and communications apparatus, air-cooling and air-conditioning apparatus, elevators, escalators, shades, awnings, screens, storm doors and windows, stoves, wall beds, refrigerators, attached cabinets, partitions, ducts and compressors, and without limitation all furniture and fixtures used or usable in the operation of a hotel, restaurant and convention center on the property, including, without limitation, beds, vanities, dressers, drapes, carpets, tables, chairs, lamps, and television sets and all of the right, title and interest of Debtor in and to any equipment which may be subject to any title retention or security agreement or instrument superior in lien to the lien of Secured Party.

This description can not be reasonably interpreted to cover any intangible personal property such as the service mark; it includes only tangible personal property.

■ Finally, the last financing statement was filed by Pioneer Bank in 1985. It described the collateral as follows:

All Inventory, Accounts Receivable and Equipment

See attached Schedule A and Schedule B

The attached schedules describe office equipment and off-premises billboards. Schedule A also includes the following descriptions:

All inventory of Debtor ...; all accounts and contract rights of Debtor ...; all chattel paper and instruments ... evidencing any obligation to Debtor for payment for goods sold or leased or services rendered....

All Equipment of the Debtor of every description used or useful in the conduct of the Debtor's business....

These descriptions include some intangible personal property but not the service mark.

The court concludes that no secured creditor perfected a security interest in the

service mark. The debtor's rights in the service mark passed to the trustee.

Equitable argues that the service mark was valueless because of the financial condition of the Choo–Choo. The court disagrees. The Choo–Choo was sold as an operating business to buyers who intended to operate it and are operating it. Furthermore, the testimony of the trustee's expert witness, A. Richard Casavant, Jr., revealed that name recognition is important to bringing business to the Choo–Choo, especially tourist business. Without the right to use the service mark, the buyers would lose the advantage of years of advertising and doing business under the name Chattanooga Choo–Choo. The court concludes that the service mark had value.

The terms of the trustee's sale leave no doubt that he sold the service mark. The bill of sale specifically includes the right to use the names Chattanooga Choo–Choo or Chattanooga Choo–Choo Company and includes the trustee's agreement to transfer the service mark to the buyers. The trustee's terms and conditions of the sale included sale of the service mark. The court's order approving the sale included sale of the service mark. Of course, the trustee could be accused of using these documents to set the stage for his argument about the service mark. The court believes, however, that these documents also show the importance to the buyers of including the service mark in the sale.

The service mark was sold to the buyers and its value was included in the sale proceeds. The court reserves the question of value until after it decides the priority dispute between Equitable and the two banks, American National and First Tennessee.

### The Priority Dispute

The relevant facts are simple. Equitable filed a financing statement in 1976. In February, 1981, the Industrial Development Board filed a financing statement to perfect its security interest that was assigned to the banks. The financing statement showed the banks as the assignee. About the same time in 1981, the Choo–Choo gave Pioneer Bank a security interest, but Pioneer Bank did not file a financing statement with the secretary of state. No financing statement was filed with the secretary of state until Equitable filed one in May, 1982, when it acquired the security interest by assignment from Pioneer. In the meantime, in late 1981, Equitable's 1976 financing statement lapsed because Equitable failed to file a continuation statement. The banks and Equitable filed continuation statements for their 1981 and 1982 financing statements.

If the court decides priority according to the financing statements that were still effective when the Choo–Choo filed its chapter 11 case, then the banks win. Since Equitable's 1976 financing statement had lapsed, the banks' had the earliest financing statement still in effect when the Choo–Choo filed its chapter 11 case. The priority rule provides that the first security interest which was perfected by filing has priority. Tenn.Code Ann. § 47–9–312(5) (1979 & Supp.1988). Thus, the banks' security interest would have priority if the court considers only the financing statements that had not lapsed before the Choo–Choo's chapter 11.

Section 9–403(2) of the UCC provides that the lapse of a financing statement makes the security interest unperfected unless filing of a financing statement is not required for perfection. Tenn.Code Ann. § 47–9–403(2) (1979 & Supp.1988).

Equitable argues that the resulting lapse in perfection of the security interest affected only transactions after the lapse; between Equitable and the banks, the lapse of the financing statement would not give the banks' security interest priority because the banks financing statement was filed when Equitable's financing statement was still in effect, i.e., before it lapsed.

The new version of § 9–403 of the UCC is clearly contrary to Equitable's argument. It provides that when a financing statement lapses and renders the security interest unperfected, the security interest is deemed to have been unperfected against a security interest that was perfected before the lapse. Tenn.Code Ann. § 47–9–403(2)(e) (Supp.1988).

The new version of § 9–403(2) did not take effect in Tennessee until 1986, which raises the question of whether it applies to this dispute. The transition provisions appear to make the old version of § 9–403 apply. Tenn.Code Ann. §§ 47–9–602 & –606 (Supp.1988).

The old version of § 9–403, unlike the new version, did not specifically say that the security interest became unperfected against security interests perfected before the lapse. However, one of the official comments to the old version of § 9–403 explained the statute that way. It said that lapse of a financing statement would give priority to a junior security interest which had been perfected by filing a financing statement before the lapse. Tenn. Code Ann. § 47–9–403, Official Comment 3 (1979).

One of the drafters of Article 9 of the UCC has said that 9–403 was drafted to adopt the rule that Equitable argues for, but this limitation was accidentally lost in printing, and the comment writer didn't know better. G. Gilmore, Security Interests in Personal Property § 21.6 (1965).

Nevertheless, some courts adopted the rule as explained in the comment. A lapsed financing statement was ineffective against financing statements filed before the lapse. *Frank v. James Talcott, Inc.*, 692 F.2d 734, 34 UCC Rep. 1720 (11th Cir. 1982); *Morse Electro Products Corp. v. Beneficial Industrial Loan Co.*, 90 Wash. 2d 195, 579 P.2d 1341, 24 UCC Rep. 997 (1978). The Tennessee Court of Appeals adopted the rule without noting that there was any dispute as to whether the lapsed financing statement should have effect against financing statements filed before the lapse. *Farmers & Merchants Bank v. Dyersburg P.C.A.*, 728 S.W.2d 10, 4 UCC Rep.2d 305 (Tenn.App.1986).

The drafters of the UCC apparently decided that the rule explained in the comment is the better rule; they added the sentence to the current version of § 9–403(2) to make the rule clear.

■ The court agrees that the better rule is to make a lapsed financing statement ineffective against other financing statements filed before the lapse. The rule that lapse affects only transactions after the lapse would create too much confusion and too many factual disputes among secured creditors.

Under this rule, the junior secured creditor who filed its financing statement before the lapse will move up in priority despite having actual notice or knowledge of the lapsed financing statement or the security interest. Lack of actual knowledge or notice is irrelevant.

Lack of knowledge or notice is crucial to the priority of some creditors who are not holders of Article 9 security interests, but it is not mentioned in the UCC statute which determines priority among the holders of perfected and unperfected security interests. Tenn.Code Ann. § 47–9–301 & 47–9–312(5) (1979 & Supp.1988).

Lack of actual notice or knowledge also is not relevant to whether a financing statement must be filed to perfect a security interest. Tenn.Code Ann. § 47–9–302 (1979 & Supp.1988).

Some creditors have argued that a lapsed financing statement should be treated the same as a financing statement mistakenly filed in the wrong place but which is nevertheless effective against any person who has knowledge of the contents of the financing statement. Tenn.Code Ann. § 47–9–401(2) (1979 & Supp.1988). The situations are not analogous.

Furthermore, a rule that actual notice or knowledge prevents the junior secured creditor from gaining priority would be almost the same as the simpler rule that lapse affects only interests acquired after the lapse, since the junior secured creditors will probably have searched the UCC filings and found the financing statement before it lapsed. Equitable argues that actual notice or knowledge gained this way or any other way should prevent the creditor who acquired or perfected its security interest before the lapse from gaining priority. This proposed rule must be rejected as likely to cause even more uncertainty than a simple rule that lapse affects only later interests. See *In re Reda, Inc.*, 54

**800**

B.R. 871, 42 UCC Rep. 1126 (Bankr.N.D.Ill. 1985); *Bank of Hornick, Iowa v. Onawa State Bank*, 368 N.W.2d 161, 40 UCC Rep. 1906 (Iowa 1985).

Equitable argues that its security interest should have priority despite the lapse of its financing statement because the Industrial Development Board or the banks agreed that their security interest would be junior in priority to Equitable's. Equitable bases this argument on provisions in the security agreement that it is "subject to" Equitable's prior security agreement.

Neither the Industrial Development Board nor the banks could do anything by themselves to give their security interest priority over Equitable's security interest. Equitable has not explained why the Industrial Development Board or the banks would agree to subordinate their security interest since it would be subordinate no matter what they did. As far as the court can tell, Equitable did not have any control over the Choo–Choo or its property that prevented the Choo–Choo from giving the Industrial Development Board a junior security interest and as a result required Equitable's agreement.

The facts are exactly the opposite to the situation in which a subordination agreement is likely. For example, Equitable had a first mortgage on the real property but agreed to subordinate it to American National's second mortgage on the ice rink. American National wanted Equitable to subordinate its first mortgage because this was the only way American National's second mortgage could have first priority on the ice rink.

Furthermore, the subordination agreement as to the ice rink was between the two secured creditors, Equitable and American National. Equitable is now arguing that the second secured creditor and the debtor can agree that the second security interest will be subordinate to the first, without regard to perfection under the UCC, and the first secured creditor can enforce the agreement without being a party to it.

The court can imagine a situation in which the borrower is a corporation and the corporate officer, who is acting on its behalf, guaranteed the senior secured debt. If he can avoid guaranteeing the new secured debt and can get the new lender to agree to subordination to the earlier security interest, without regard to the perfection rules of Article 9, then he can protect himself from ever having the new secured lender take the collateral ahead of the earlier secured debt he guaranteed. The corporate officer on behalf of the corporation might ask the new lender to agree to subordinate its security interest without regard to the perfection of the earlier security interest.

The court can not imagine the new secured creditor agreeing to this proposal. There is nothing in this case to prove any such subordination attempt between the Choo–Choo and the Industrial Development Board for Equitable's benefit as a third party beneficiary.

Finally, the statement that the security interest given to the Industrial Development Board was "subject to" Equitable's security interest was necessarily true as a matter of fact. The statement was not a promise to anyone that the security interest could never gain priority over Equitable's security interest. Anytime a debtor gives a second security interest in the same property, the transfer is necessarily subject to the earlier transfer of a security interest to another creditor, and this is true without regard to whether either creditor has perfected or will perfect or will maintain the perfection of its security interest. The parties are not agreeing that the earlier security interest will have priority.

The court concludes that the banks' security interest has priority over Equitable's earlier security interest. It also has priority over Equitable's other security interest and Pioneer Bank's security interest, since they were perfected later. Tenn.Code Ann. § 47–9–312 (1979 & Supp.1988). Equitable's other security interest is, of course, second in priority.

This conclusion leads the court to the questions mentioned earlier. First, there is the dispute between the banks and Equitable over whether some items are fix-

tures or purely personal property. Equitable's mortgage entitles it to the proceeds from the fixtures, despite the conclusion that the bank's security interest in personal property has priority over Equitable's security interest in personal property. Tenn.Code Ann. § 47–9–313 (1979 & Supp.1988); *Lenoir Land Co. v. Haynes Heating Co.*, 166 Tenn. 494, 63 S.W.2d 659 (1933).

### The Railroad Cars

■ The Choo–Choo Hotel includes railroad cars that have been converted into hotel rooms, dining cars, a lounge, and a conference car.

The value of all the bedroom cars is about $720,000 according to the bank's appraiser, Sam Furrow of Furrow Auction Company. This is the fair market value rather than the going concern value. Sam Furrow gave the going concern value of the bedroom cars as $1,200,000. Apparently there are only 24 cars with 48 bedrooms, rather than 48 cars.

The banks' expert witness on railroad cars was Robert Maury Soule of the Tennessee Valley Railroad Museum. He testified that the cars would be worth more to a buyer who intended to use them as hotel cars. The cost of making a car usable again as a railroad day coach would probably be prohibitive.

The cars weigh 60 to 80 tons each. They are attached to water, sewer, and electrical power lines and have the usual plumbing and electrical fixtures for a hotel room. The wheels are not welded to the tracks. They are chocked by small pieces of metal that are welded to the tracks not the wheels. The suspension systems have been stiffened, to keep the cars from rocking on their springs as hotel guests move about. This was done by welding the springs in appropriate places. The cars can not be safely pulled on a railroad track without removing these welds so that the suspension systems will work.

Mr. Soule estimated that it would cost $5,000 to $6,000 just to move one car with two cranes of adequate capacity.

In addition to the bedroom cars, there are four other cars similarly affixed and converted for other uses. One is a diner car, one is the so-called pizza car, one is the conference car, and the other is the lounge car.

Suppose you represented a bank that was considering making a loan to the hotel to be secured by all personal property. You went to the hotel and looked at these railroad cars converted to hotel rooms, diners, a lounge, and a conference room, all of them with the necessary electrical and plumbing connections and generally trapped within the old railroad station by a hotel and parking lots. Would you make the loan on the assumption that the railroad cars are purely personal property and therefore are not subject to prior mortgages on the real property? Surely not. Suppose you intended to take a mortgage on the real property. Would you expect the railroad cars to be covered as fixtures? Surely you would.

The banks' main argument is that the railroad cars are not fixtures because they can be removed without substantial damage to the real property. Under Tennessee law, however, the court must also consider (1) annexation to the real property and (2) the intention of the parties. Annexation to the real property deals mostly with how difficult it would be to remove the alleged fixture. Even though removal would not cause substantial damage to the real property, the difficulty of removal may tend to show that the attached property is a fixture. The intention of the parties means not just the subjective intent of each party but also the objective intent of the parties. See *In re Hammond*, 38 B.R. 548, 38 UCC Rep. 659 (Bankr.E.D.Tenn.1984); *In re Mayfield*, 31 B.R. 900 (Bankr.E.D.Tenn. 1983); *In re Belmont Industries*, 1 B.R. 608, 28 UCC Rep. 846 (Bankr.E.D.Tenn. 1979).

These factors show that the railroad cars should be considered fixtures. They can be removed only at great cost and with great difficulty. These railroad cars might be called former railroad cars. Now they are hotel rooms, restaurants, and a conference

room. They are no more railroad cars in the sense that they can be used on a railroad than a double-wide mobile home on a foundation is a *mobile* home. *In re Fink*, 4 B.R. 741, 29 UCC Rep. 1431 (Bankr.W.D. N.Y.1980).

Furthermore, the railroad cars were affixed to the real property by the owner of the real property as part of the hotel complex. Indeed, the railroad cars as hotel rooms are a trademark of the Choo–Choo.

The court concludes the railroad cars used as hotel rooms, dining cars, a lounge, and a conference room are fixtures, and therefore, Equitable's first mortgage on the real property is the first lien on these railroad cars.

### Other Fixture Questions

■ The banks argued that the shrubbery, the decorative plants, and the signs on the premises are all personal property rather than fixtures.

Sam Furrow, the banks' appraiser, testified that the plants and shrubs which he appraised as personal property are all potted plants in the greenhouse or elsewhere on the premises. They are not planted in the ground. The court concludes that these potted, easily movable plants are personal property rather than fixtures. The court reserves the question of value until it must value all the personal property, including the service mark.

As to the signs, the bank's appraiser, Mr. Furrow, did not describe them, but there was no dispute that there are signs attached to the buildings. Equitable's appraisal includes several marquee type signs attached to buildings and valued at $15,000 fair market value. It also includes railroad signals and other items that may be classified as signs in the banks' appraisal.

The lack of proof raises evidence questions. Should the court presume that the signs are fixtures or that they are purely personal property? Who should have the burden of proving one way or the other?

The court has found only one case that deals with the problem. The court held that the attachment of equipment to the building did not raise a presumption that the equipment was a fixture, and therefore the lack of proof led to the conclusion that the equipment was personal property. *In re F.R. of North Dakota, Inc.*, 54 B.R. 645, 41 UCC Rep. 265 (Bankr.D.N.D.1985). This seems to be a reasonable approach in light of modern methods of installing and removing goods attached to real property. See also *Cummings, Inc. v. Beardsley*, 271 Ark. 596, 609 S.W.2d 66, 30 UCC Rep. 1133 (1980) (gigantic billboard a fixture); *Trans–Nebraska Corp. v. Cummings, Inc.*, 595 S.W.2d 922, 28 UCC Rep. 844 (Tex.Civ.App.1980) (small billboard not a fixture). The court concludes that the signs are personal property.

■ The bank next argued that three trolley cars are not fixtures. None of these trolleys is attached to the real property in any way other than being set upon the track. The court concludes that the trolleys are purely personal property and not fixtures.

As to the signs and the trolleys, the court also reserves the question of value until the overall valuation of personal property.

There is another railroad car that is not attached to water or sewer lines and has not had its suspension welded. It is a special car that is made of stainless steel, or at least, more stainless steel than the normal railroad passenger car. It apparently is on a connected track, and cranes would not be required to move it. The court concludes that it is purely personal property and not a fixture. Valuation is postponed until the overall valuation of personal property, which follows immediately.

The court will first compare the fair market valuations of all personal property by the banks' appraiser and Equitable's appraiser.

The banks' appraiser found the fair market value of all the personal property to be $2,377,655. This included $760,000 from the railroad cars that are fixtures. It did not include the Hitachi telephone system that Equitable's appraiser valued at $22,-000. Subtracting $760,000 and adding $22,-000 makes the total $1,639,655.

Equitable's appraiser valued all the personal property at $1,371,026. This appears to include signs and plants that were also included in the banks' appraisal. (Exh. C at pp. 135 & 139; Exh. B at pp. 39 & 40). But it does not include the special railroad car that the court found to be personal property. For the purpose of adding the car's value to Equitable's appraisal, the court will use the banks' appraisal of $15,000 fair market value, which was lower than Mr. Soule's valuation. This makes the total $1,386,026.

Thus, the comparable fair market valuations are $1,386,026 for Equitable and $1,639,655 for the banks.

The court turns now to the question of going concern value. When the court subtracts the going concern value of the railroad cars that are fixtures ($1,270,000) from the banks' total going concern value, the total is $2,411,095.

The court is faced with adding a going concern value for the Hitachi telephone system, but there is only Equitable's fair market valuation of $22,000. Using the banks' appraisal, the ratio of the total going concern value to the total fair market value is 1.47. This ratio is within the banks' appraisal except for the court's addition of the value of the telephone system to the fair market valuation, which should not have much effect. If the court multiplies the value of the telephone system by 1.47, the result is $32,340. When this is added, the banks' going concern valuation is $2,443,435.

The court will assume that the maximum going concern valuation for Equitable would be its fair market valuation multiplied by 1.47, which gives a total of $2,037,458.

An appraisal done in June, 1987, and updated in January, 1988, gave the personal property a going concern value of $2,797,500. The appraiser was of the opinion that the value had dropped by 10% at the time of this dispute, which would make the value $2,517,750. This appraisal apparently does not include the trolleys and the one railroad car that is not a fixture.

In 1987, the assessed value of the personal property for tax purposes was $2,557,803. This assessment apparently was used for 1988. The assessed value of the real property for tax purposes was $8,683,500 in 1986 and 1987. (Exh. A at pp. 13–14).

The sale price of all the real and personal property, including the service mark, was between $9,100,000 and $10,000,000, depending on how much of the $900,000 difference the buyers must use for environmental cleanup at the property.

Since all the property was sold as a going business, the going concern value should be used to decide how much of the total proceeds came from the sale of the personal property. 11 U.S.C.A. § 506(a); 3 L.King, Collier on Bankruptcy ¶ 506.04 at 506–26—506–27 (15th ed.1988). This makes Equitable's appraisal irrelevant unless the court uses its estimate that the maximum going concern value under Equitable's appraisal would be about $2,037,000.

The court begins with this amount and the banks' going concern value of about $2,443,000. When the court compares these valuations to the actual sale price, the value of the personal property was between 20% and 27% of the total value. The court is slightly surprised by this percentage, but the tax appraisals support it. The total appraised value for tax purposes was $11,241,300, which included personal property valued at $2,557,803 or about 23% of the total appraised value.

Things being as they are, the court suspects that the banks' appraisal at more than $2,400,000 is too high and the court's extension of Equitable's appraisal to about $2,000,000 is too low. The court has not analyzed the appraisals item by item. The appraisals can be compared because the banks' appraiser included both fair market value and going concern value. The fair market value in the two appraisals are close on many items, with the banks' appraisal generally running higher as expected. In some instances, there are major differences. For example, the banks' appraiser valued the three trolleys at $50,000

fair market value, while Equitable's appraiser valued them at $16,000 fair market value.

The court believes that the value of all the personal property should be about 23% of the total sale proceeds. Thus, the value of all the personal property was about $2,100,000 to $2,300,000. The court will take the in-between value of $2,200,000 as the total going concern value of all the personal property.

Not all of this amount will go to the banks. Pioneer Bank and the trustee will receive out of this amount the value of the vehicles as previously determined. There will be a holdback of $4,000 until resolution of the dispute concerning the International truck. There must also be a holdback to pay either the value of the Hitachi telephone system or the amount of the secured debt to Merchants National Bank. The court need not determine the exact value of the plants and shrubbery, the trolleys, the special railroad car, or the signs since their value is included in the value of all the personal property under the court's method of calculation. The largest deduction, however, may be the value of the service mark. Its value obviously should be included in the going concern value of the personal property. Indeed, the service mark doubtlessly accounts for at least part of the difference between the fair market value and the going concern value of all the property. The value of the service mark will be determined next.

A. Richard Casavant, Jr., appraised the service mark for the trustee. He is a professor at the University of Tennessee at Chattanooga and has a doctorate degree in marketing. He has done at least one similar appraisal. He testified as follows.

In valuing a service mark, trademark or brandname, you are trying to determine the value of name recognition. There are at least three ways to determine this value. First, you can compare sales of a well-known brand to lesser known brands. Second, you can determine what a third party would pay for use of the brand name. Third, you can consider what it would cost a purchaser of the business to build up the same amount of name recognition for a different name. Professor Casavant chose the third method as the one most suitable for determining the value of name recognition to a hotel and convention center.

He used statistics from another local tourist attraction, Rock City, on the assumption that their tourist business is similar. (See Exh. A, appendix exh. 9). He used only the tourist part of the Choo-Choo's business on the assumption that the Choo-Choo's lack of a known franchise, such as Hilton or Holiday Inn, reduces the number of business visitors more than it reduces the number of tourist visitors. As to the effect of the Choo-Choo's financial problems, he treated it as inherent in using the figures for 1988 since the Choo-Choo was in chapter 11 for the entire year.

He estimated that the Choo-Choo would lose 10% of its tourist business in 1989 if it were no longer the Choo-Choo and had to operate under a different name. He calculated that a 10% reduction in tourist business would deprive the Choo-Choo of about $400,000 that it would otherwise have to apply to its fixed operating costs. He used this as the estimated value of the service mark.

He assumed that a buyer could not afford to create in one year the same name recognition for a new name that the Choo-Choo created for itself in fifteen years; therefore he assumed that advertising costs would stay about the same. This is why he used a loss-of-revenue valuation rather than an estimate based on saved advertising costs and no loss of business if the Choo-Choo name carried over.

According to the June, 1988, appraisal by Schultz, Martin, Carr & Associates, the Choo-Choo's promotion and advertising costs were highest in the first year of operation at 5% of total revenue. Thereafter, they stabilized at about 2.5% until 1986, then dropped to 1.4% in 1987, and jumped to 4.7% in 1988. They estimated that stabilized advertising costs should be about 3.25% of total revenue. As to the amounts, 1.4% of 1987 total revenue was about $130,000, and 4.7% of the 1988 total

revenue was about $390,000. (Exh. A at pp. 31–32).

According to the court's earlier conclusions, the going concern value of the personal property exceeded the fair market value by $600,000 to $800,000.

Professor Casavant was forced to do his valuation on some assumptions he might find to be incorrect if he were given the time and money to do a more thorough investigation. Suppose the business had to operate under a different name but obtained a well known franchise. What increase in business could be expected? Would the increase be mostly business travelers or would it also increase the number of tourists? Would the overall increase more than offset the costs of the franchise and part or all of the business lost as a result of the name change? With the franchise, would the other advertising costs increase to make up for the name change, remain stable, or drop, and how would the other advertising costs plus the additional franchise costs compare to the total business lost or gained? Could the lost business be made up in other ways? (Exh. A, appendix exh. 9).

The court has already remarked that the amount by which the going concern value of a tourist attraction and hotel exceeds its fair market value must be attributed partly to things such as name recognition. The increase in value would apply to both the personal property and the real property. If the right to use the Choo–Choo name increased the value of all the property by $400,000, should this increase be divided between the real property and the personal property? If the $400,000 estimated increase is attributed only to the personal property, it accounts for one-half to two-thirds of the difference between the fair market value and the going concern value of all the personal property.

The court finds the $400,000 estimate of the value of the service mark to be too high as an estimate of the portion of the sale proceeds that came from its sale. The court could use the 77–23% split between real and personal property to say that only 23% of the estimated $400,000 increase in the value of all the property should be attributed to the sale of the personal property. The logic is suspect, however, since the service mark was personal property. Furthermore, the court suspects that the value of real estate is more stable, as a general rule, and therefore, the sale of all the property as a going business probably increased the value of the personal property more than it increased the value of the real property. In any event, the court can say that the ratio of the value of the personal property to the value of all the property is not necessarily the right ratio to use for reducing the $400,000 estimate.

The court concludes that the value of the service mark as personal property should be at least $200,000, in light of the potential revenue loss to the buyers if they had not obtained the service mark and the savings in promotion and advertising costs as a result of obtaining the service mark.

### Summary

Set aside from the proceeds of the ice rink an amount to pay American National Bank its allowed secured claim, after it is determined by the court.

Pay Pioneer Bank from the proceeds of the real property $25,500 as the proceeds received from the sale of tract 5.

Set aside $2,200,000 as the proceeds from the sale of the personal property.

Pay the remaining proceeds from the real property, including the ice rink, to Equitable.

Pay the proceeds of the personal property as follows:

Retain an amount sufficient to pay the claim of Merchants National Bank or the value of the Hitachi telephone system.

Pay Pioneer Bank $27,000 as the proceeds of three vehicles.

Pay the bankruptcy trustee $10,700 as the proceeds of three vehicles.

Retain $4,000 to pay Pioneer Bank or the trustee as the proceeds from the sale of an International truck.

Pay the bankruptcy trustee $200,000 as the proceeds of the service mark.

Apply the remainder first to the allowed secured claim of American National

Bank and First Tennessee Bank, when the amount is determined.

Apply the remainder, if any, to Equitable's secured debt.

The money can be paid out immediately only (1) on the condition that the secured creditors will pay the trustee any administrative expenses that the court subsequently decides that they should pay from the proceeds of their collateral or (2) if a percentage from the payments to everyone but the trustee is retained to cover administrative expenses.

The parties shall submit a suggested order or orders.

This memorandum constitutes findings of fact and conclusions of law. Bankruptcy Rule 7052.